CONEY ISLAND CO. v. McINTYRE-PAXTON CO.

(Circuit Court of Appeals, Sixth Circuit. November 7, 1912.)

No. 2,217.

1. CORPORATIONS (§ 426\*)—CONTRACT MADE BY OFFICER—RATIFICATION—ACCEPTANCE OF BENEFITS.

The acceptance by a corporation for years of all the benefits of a contract made in its behalf by its president, and which was not ultra vires, was a ratification, and the corporation cannot thereafter attack its validity on the ground of want of authority in the president to make it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1596, 1702–1704, 1707, 1708, 1710–1716; Dec. Dig. § 426.\*]

2. LICENSES (§ 44\*)—RESPECTING REAL ESTATE—"LICENSE" AS DISTINGUISHED FROM OTHER RIGHTS—REVOCATION—"INTEREST" IN LAND.

Plaintiff owned and conducted an amusement park, in which defendant operated certain devices, paying plaintiff a percentage of their earnings for the privilege. In settlement of a disagreement between them, a contract was made by which defendant transferred to plaintiff a part of its

capital stock and other property, and which provided that defendant should own and operate its devices as previously, and on the same terms as to percentages, "as long as the present owners continue to hold their stock and the privileges are granted" by plaintiff. *Held*, that the contract was not a mere license, revocable by plaintiff at pleasure, but gave defendant a certain interest in the qualified use and possession of the land, to continue during a period whose limits were determined, although uncertain in years (citing 4 Words and Phrases, 3696–3709).

[Ed. Note.—For other cases, see Licenses, Cent. Dig. §§ 97–99; Dec. Dig. § 44.*

For other definitions, see Words and Phrases, vol. 5, pp. 4133–4141; vol. 8, p. 7691.]

**3.** ACKNOWLEDGMENT (§ 4*)—CONTRACT AFFECTING LAND—NECESSITY OF ACKNOWLEDGMENT—"DEED"—"LEASE."

Such contract was not, however, a "deed, mortgage, or lease of any estate or interest in real property," within the meaning of Rev. St. Ohio, § 4106 (Gen. Code, § 8510), requiring such instruments to be witnessed and acknowledged, since the right of use and possession given defendant thereby was not exclusive, but merely a limited and qualified right, shared with plaintiff, for certain purposes and certain periods, and, being in writing and signed by the parties, was valid.

[Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 7–21; Dec. Dig. § 4.*

For other definitions, see Words and Phrases, vol. 2, pp. 1919–1924; vol. 5, pp. 4043–4049; vol. 8, pp. 7630, 7702, 7703.]

**4.** CONTRACTS (§ 176*)—CONSTRUCTION—QUESTIONS FOR JURY.

The provisions of such contract as to its duration are ambiguous, and incapable of a definite construction as matter of law, except that defendant's tenure cannot fairly be held to continue so long as any concessions or privileges may be granted to others by plaintiff, and with that limitation the construction of the contract in that respect is a proper question for the jury, considering it in the light of the relations of the parties and the circumstances surrounding its execution.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 767–770, 917, 956, 979, 1041, 1097; Dec. Dig. § 176.*]

In Error to the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

Action at law by the Coney Island Company against the McIntyre-Paxton Company. Judgment for defendant, and plaintiff brings error. Reversed.

The plaintiff in error owns and conducts an amusement park on the Ohio river near Cincinnati. It brought this suit to recover possession of those portions of its premises on which stood certain amusement devices owned by defendant, including roller coaster and merry-go-round. The facts requiring present statement are these:

For many years past plaintiff has granted, from year to year, privileges or concessions for operating at its park amusement schemes of various kinds, including those above referred to. One Hunt, who held the privileges at Coney Island for various devices, including those above mentioned, died in 1901. Thereupon his representative conveyed all his rights, including the amusement structures, to Malcolm W. McIntyre and David C. Paxton for $2,650; the money for this purpose (and $350 in addition) being borrowed from one Brooks, the president of the plaintiff company. The note therefor was duly paid in installments, with interest. The devices were operated in the name of McIntyre & Paxton, as a partnership, until 1904, when the business was incorporated under the name of the "McIntyre-Paxton Company," with a capital

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

stock of $6,000; McIntyre and Paxton conveying to the new corporation the assets belonging to the former partnership (which had been materially increased since the original purchase from Hunt), at a consideration of about $16,000, taking in payment the entire capital stock of the new corporation and the latter's note to McIntyre and Paxton for $10,300. The corporation paid its first dividend in 1905. Plaintiff demanded one-half the dividend, upon the ground that it was entitled to one-half the stock in the defendant company; the specific claim being that Thomas W. Paxton, who was the general manager of the plaintiff company at the time of the purchase of Hunt's rights, acquired by that purchase a one-half interest therein, and became the legal owner of one-half the partnership assets of McIntyre & Paxton, and of one-half the stock of the McIntyre-Paxton Company, in trust for the plaintiff. McIntyre did not, at the time, dispute plaintiff's claim, although upon the trial below disputing it, and attributing his prior acquiescence to the fact that he was then the general superintendent of plaintiff and could not afford to do otherwise. David C. Paxton has always denied plaintiff's contention. Thomas W. Paxton died before the controversy arose.

Plaintiff brought suit in equity to obtain adjudication of its claimed rights. The suit was settled and the bill dismissed on plaintiff's motion, upon the making of the following written agreement:

"Memorandum of agreement entered into this 7th day of February, 1906, by and between the Coney Island Company and the McIntyre & Paxton Company:

"First. The McIntyre & Paxton Company are to deliver to the Coney Island Company one-half of all the stock of the McIntyre & Paxton Company; also to turn over to the Coney Island Company one-half of the amount of the notes given by the McIntyre & Paxton Company to M. W. McIntyre and D. C. Paxton.

"It is further agreed that the said D. C. Paxton shall draw from the said McIntyre & Paxton Company the sum of five hundred ($500.00) dollars, being payment in full for all past extra services. Then the Coney Island Company shall draw the sum of two thousand ($2,000.00) dollars from the said McIntyre & Paxton Company, being in payment in full for past dividends up to this date; the other stockholders having drawn their dividends. Then the company of the McIntyre & Paxton Company shall own all of the amusement schemes as they were owned previous, and run them just as they have in the past, paying the same percentage to the Coney Island Company for the privileges. The said D. C. Paxton to take charge of the same, and for his services he shall receive the sum of seventy-five ($75.00) dollars per month while operating the same.

"Should any other schemes of amusement be built or purchased, they shall be paid for as the holders of the stock designate, but it is hereby agreed that the Coney Island Company will, and does permit, the other stockholders to draw upon their one-half of the stock the sum of two-thirds of all dividends made. The Coney Island Company accepting one-third of the amount of dividends made for their one-half of the stock. This contract to continue as long as the present owners continue to hold their stock and the privileges are granted by the Coney Island Company. All repairs and expenses incurred by the McIntyre & Paxton Company are to be paid by the company before any dividends are paid.

"This contract signed in duplicate this 7th day of February, 1906."

The agreement was signed by plaintiff and defendant, as well as by McIntyre and D. C. Paxton. Certificates representing one-half the capital stock of the defendant company were indorsed and delivered to plaintiff. The transfers, however, were not registered upon defendant's books. One-half the amount of the McIntyre & Paxton note was, by indorsement thereon, made payable to plaintiff. The $500 provided to be paid to Paxton for past extra services, as well as the $2,000 payable to plaintiff for past dividends, were duly paid. The defendant continued thereafter to operate the devices during the amusement seasons from year to year, until and including 1910, on the same rental as before February 7, 1906 (viz., one-third the gross receipts from such operation, defendant paying one-half the wages of plaintiff's cashier); Paxton receiving for his services $75 per month, as provided in the

1906 contract, and dividends being paid in the proportion provided thereby. In 1910 plaintiff criticised a portion, at least, of defendant's devices, as out of date· and inadequate, and negotiations were had with respect to their improvement. There was testimony tending to show that these criticisms were justified. On January 14, 1911, McIntyre and Paxton, on behalf of·the defendant, offered to purchase plaintiff's interest in the defendant company for $2,-000, or, with the approval of plaintiff, to expend for the next season not less than $3,500 for the improvement and betterment of the amusement schemes. No satisfactory agreement was reached, and on February 4, 1911, plaintiff's board of directors passed a resolution not to grant defendant privileges for the season of 1911, and directing plaintiff's officers to require defendant forthwith to remove its buildings, machinery, and apparatus from the park. The resolution also announced the termination of the provisions of the 1906 agreement, by which the payment of $75 per month to Paxton was assented to, and the McIntyre & Paxton stockholders allowed to draw two-thirds of the dividends. Defendant and Paxton gave notice that they insisted "upon their rights and privileges under their contract" of February 7, 1906, and proposed to continue operations for the ensuing season.

Thereupon plaintiff began this suit, and immediately after, without further notice to defendant, dismantled and removed defendant's buildings and apparatus. Privileges were granted to other concessioners for the ensuing season for some, at least, of the devices formerly operated by defendant; plaintiff conveying to one of the concessioners a portion of its stock in the defendant company, but whether before or after suit begun does not appear. Upon the trial below defendant contended that the 1906 agreement should be construed as granting defendant the amusement privileges in question so long as the owners of the stock in the defendant company, who were such owners on February 7, 1906, should own their stock, and privileges of operation of amusement schemes and devices should be granted out by the Coney Island Company; that it to say, to any one. It also claimed, apart from the contract of February 7th, the right to possession during the season of 1911, by reason of the making of a contract between plaintiff and defendant and the Camm & Lanigan Company for the operation by the latter company of a concession held by defendant. By cross-petition, damages were claimed for the destruction of and injury to defendant's buildings and devices, some of which, at least, were shown to have been removed with unnecessary injury thereto. Plaintiff contended that the 1906 contract was merely a license revocable at will, and continued only so long as plaintiff should actually grant to defendant the privileges of operation in question. It is not claimed that the concessions were granted defendant otherwise than from season to season, unless by the terms of the 1906 contract. If the agreement was only from season to season or year to year, plaintiff had the right, apart from the Camm & Lanigan arrangement, to terminate defendant's concessions at the time plaintiff attempted so to do. Plaintiff also contended that the 1906 contract was invalid as a grant of privileges for a definite term other than from year to year: First, for lack of authority in plaintiff's president to make a contract so construed; and, second, because, if so construed, it was not executed and acknowledged as required by the statutes of Ohio.

The trial court held that Brooks, as president and general manager, was given apparent authority to make the agreement, that the latter was ratified by plaintiff, and it estopped from denying Brooks' authority, admitted testimony of oral statements of plaintiff's president in connection with the execution of the contract tending to support defendant's contention, and submitted to the jury this question of construction, holding that the term "present owners" meant McIntyre and Paxton and their relatives, who held certain qualifying shares out of McIntyre and Paxton's one-half of the stock. The jury found the right of possession to be in the defendant by virtue of the 1906 agreement, and assessed defendant's damages at $15,000. Judgment was rendered accordingly, with provision that defendant retain possession of the premises "as long as the owners of the stock in the McIntyre & Paxton Company, who were owners of said stock on February 7, 1906, prior to the signing of said contract, shall own their stock, and privileges of operation of amusement schemes and devices are granted by the Coney Island Company."

Peck, Shaffer & Peck, and Waite & Schindel, all of Cincinnati, Ohio, for plaintiff in error.

B. T. Archer, Rufus B. Smith, and Chas. A. Groom, all of Cincinnati, Ohio, for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge (after stating the facts as above). [1] 1. We find it unnecessary to consider the question of real or apparent authority in plaintiff's president to make the contract. The agreement was not ultra vires the corporation. The latter has never attempted to repudiate it. On the contrary, it has received and retained substantial benefits under the contract, including the concession of plaintiff's claimed ownership of one-half the stock, the payment of $2,000 as dividends accrued previous to February 7, 1906, and the receipt of annual dividends from the latter year until 1910. Moreover, the corporate action of February 4, 1911, expressly recognized the existence of the contract. Its ratification is thus established. Indianapolis Rolling Mill v. St. Louis, etc., R. Co., 120 U. S. 256, 7 Sup. Ct. 542, 30 L. Ed. 639; Railway Companies v. Keokuk Bridge Co., 131 U. S. 371, 381, 9 Sup. Ct. 770, 33 L. Ed. 157.

[2] 2. Was the agreement, so far as it attempted to give defendant a right to occupy plaintiff's land, merely a revocable license? As said in Morrill v. Mackman, 24 Mich. at page 282, 9 Am. Rep. 124:

"A license is a permission to do some act or series of acts on the land of the licensor without having any permanent interest in it. * * * It is founded on personal confidence, and, therefore, not assignable. * * * It may be given in writing or by parol; it may be with or without consideration; but in either case it is subject to revocation, though constituting a protection to the party acting under it until the revocation takes place. Where nothing beyond a mere license is contemplated, and no interest in the land is proposed to be created, the statute of frauds has no application, and the observance of no formality is important. But there may also be a license where the understanding of the parties has in view a privilege of a less precarious nature. * * * Wherever, in short, the purpose has been to give an interest in the land, there may be a license: but there would also be something more than a license, if the proper formalities for the conveyance of the proposed interest have been observed. What that interest shall be called in the law may depend upon the character of the possession, occupancy, or use the promisee is to have, the time it is to continue, and perhaps upon the mode in which the compensation, if any, is to be made therefor."

See, also, State v. Holmes, 38 N. H. at page 227; Baltimore & H. R. R. Co. v. Algire, 63 Md. 319, 322; De Haro v. United States, 5 Wall. 599, 627, 18 L. Ed. 681; Johnson v. Skillman, 29 Minn. 95, 98, 12 N. W. 149, 43 Am. Rep. 192; Nowlin Lumber Co. v. Wilson, 119 Mich. 406, 410, 78 N. W. 338; Mumford v. Whitney, 15 Wend. (N. Y.) 381, 388, 30 Am. Dec. 60.

We think it a misnomer to call the agreement before us a mere license. As construed below, it was not intended to continue merely at the will of the plaintiff. It recognized an interest in defendant in the qualified use and possession of plaintiff's land. It was intended to constitute a limitation upon plaintiff's sole use and possession of its land, so far as inconsistent with defendant's qualified and concurrent right

of possession, and to the extent necessary for the performance of the contract. It was not for an indefinite or permanent term, in a strict sense, but was to continue during a period whose limits were determined, although as yet uncertain in years. It pertained to the use of personal property, in whose beneficial use plaintiff was directly interested. It provided for action to be done on plaintiff's land for its benefit, not merely to be derived from its interest in the defendant, but through compensation to be paid directly to plaintiff for right to so operate. The defendant, moreover, as well as the plaintiff, was under express obligation to perform it. Such rights, we think (if effectively conveyed), amount to an interest in the land, as distinguished from a mere license. Stambaugh v. Smith, 23 Ohio St. 584, 591; Ormsby v. Ottman (C. C. A. 8), 85 Fed. 492, 497, 29 C. C. A. 295; 4 Words and Phrases, 3696, and following.

[3] But the validity and effect of the instrument is governed by the laws of Ohio. McCormick v. Sullivant, 10 Wheat. at page 201, 6 L. Ed. 300; DeVaughn v. Hutchinson, 165 U. S. 566, 570, 17 Sup. Ct. 461, 41 L. Ed. 827. The agreement satisfied the Ohio statute of frauds (section 4198, Rev. Stat.; G. C. § 8620), which requires that grants of interests in lands be "by deed or note in writing, signed by the party, etc." Unless, therefore, the agreement is required to be executed with the formalities demanded by section 4106 of the Revised Statutes (G. C. § 8510), it is sufficiently executed. We find nothing in the decisions of the Supreme Court of Ohio opposed to this view. Rodefer v. Railroad Co., 72 Ohio St. 272, 74 N. E. 183, 70 L. R. A. 844, merely determines that a siding or switch track, constructed by the railroad company from the railroad to the manufacturer, at the expense and over the land of the latter, solely for its benefit and for the sole purpose of affording it facilities for receiving and shipping freight, and under a written agreement, silent as to the length of time it is to remain, may not be maintained by the railroad company against the objection of the manufacturer; that agreement, so far as the right of the railroad company is concerned, being held merely a license, revocable at the option of the licensor or his grantee. Fowler v. Delaplain, 79 Ohio St. 279, 87 N. E. 260, 21 L. R. A. (N. S.) 100, decides no proposition of special interest to this case, unless that mere naked acquiescence in the construction of valuable improvements, or the expenditure of money on the faith of the license, will not render it irrevocable.

The case most relied on by plaintiff is Yeager v. Tuning, 79 Ohio St. 121, 86 N. E. 657, 19 L. R. A. (N. S.) 700, 128 Am. St. Rep. 679, where it was held that:

"A parol agreement by several adjoining landowners to erect and maintain telephone poles on their respective lands, and to contribute equally to the expense of stringing wires thereon, and of operating a telephone line, does not create an easement, but is merely a parol license, and is revocable by any one of such owners, although in reliance thereon the poles have been erected and the line constructed."

But the agreement there involved was, in fact, entirely oral. Whether plaintiff's seal is attached to the contract before us does not clearly appear from the printed record. In Ohio the distinction between oral

and parol contracts seems to have been obliterated by section 4, R. S. (G. C. § 32), which abolishes private seals.

3. Section 4106 of the Revised Statutes of Ohio (section 8510, G. C.) provides that a "deed, mortgage, or lease of any estate or interest in real property, shall be signed by the grantor, mortgagor, or lessor, and such signing shall be acknowledged by the grantor, mortgagor, or lessor" in the presence of two attesting and subscribing witnesses, the signing of the instrument to be acknowledged by the grantor, mortgagor, or lessor before one of certain named officers, who is required to indorse thereon a certificate of such acknowledgment. A lease 'for a term not exceeding three years is excepted from the operation of this statute. R. S. § 4112; G. C. § 8517. Plaintiff contends that all agreements authorizing the special use of lands for particular purposes, whether for a definite or an indefinite period of time, and although "executed" and followed by the erection of valuable improvements, confer but a revocable license when not executed in conformity with this statute.

Plaintiff relies upon Wilkins v. Irvine, 33 Ohio St. 138. The action there was by cross-petition for rescission of contract of purchase and for return of purchase money paid, on the ground that the agreement referred to constituted an incumbrance. It was decided, as stated in the first syllabus, that:

"A written license, without seal and unacknowledged, to enter upon and imbed water pipes in the land of another, with privilege to enter and repair them, creates no interest in, nor incumbrance upon, the land such as will disable the owner thereof from making a good and sufficient deed conveying a good title thereto."

Manifestly, the language of the syllabus is not a decision that a contract like that before us amounts only to a revocable license. The opinion states that:

"From two considerations a majority of the court think a case for a rescission of the contract is not made by the cross-petition.

"(1) An interest in, or permanent incumbrance upon, land in this state, can only arise from some of the modes provided for or recognized in law. If it exists in this case, the incumbrance was created by a writing without seal and unacknowledged, and unaccompanied by actual possession. The statute (S. & C. § 6458) provides 'that when any man * * * shall execute, within this state, any deed, mortgage, *or other instrument,* by which any lands, tenements, or hereditaments shall be conveyed *or otherwise incumbered in law,* such deed, mortgage, *or other instrument* of writing shall be signed, sealed, etc., and such signing and sealing shall be acknowledged by such grantor or maker in the presence of two witnesses, who shall attest such signing,' etc."

The writing there in question was said to be "at most a license to enter upon the land for a specific purpose," and to create no incumbrance upon or easement in the land. The policy of the statutes was referred to as "requiring that contracts respecting the title to land shall be by deed or other written instrument under seal." The other consideration was that such instrument was not recorded or recordable; and as the pipes were hidden from view in the ground, and the licensee without visible open possession of any portion of the land, Wilkins was "an innocent purchaser, and in relation to him there is no such incumbrance of the land as will affect the title Irvine has

tendered him." Not only is the question of statutory execution connected in the opinion with questions of possession and notice, but it is the rule of the Supreme Court of Ohio that the proposition decided is only that stated in the syllabus of the case. We think Wilkins v. Irvine does not decide that, even under the statute then existing, the contract before us created only a revocable license. In Yeager v. Tuning, supra, the syllabus in Wilkins v. Irvine, to which we have referred, was quoted as stating the law of Ohio. But none of the cases since Wilkins v. Irvine are decisive of the question of statutory construction.

But, assuming that Wilkins v. Irvine does construe the then existing statute as applying to an instrument of the kind we are considering, does it follow that such must be the construction of the present statute? It will be observed that the words "or other instrument" and "otherwise incumbered in law," italicized in the opinion of the court in Wilkins v. Irvine, are not found in the present statute. In absolute legal strictness the words, "a deed, mortgage, or lease, of any estate or interest in real property," are broad enough to embrace an instrument conferring rights such as are attempted to be conferred by the agreement in question. But for some reason the Legislature saw fit to change the statute, and, in fact, since the decision in Wilkins v. Irvine. It is to be presumed that some reason for the change was in the legislative mind. It surely was not intended to make the statute broader than before. There is much to commend itself in the view that the Legislature intended to narrow the statute, and confine its operation to such instruments as in common parlance would be regarded as deeds, mortgages, or leases, and are usually recorded as such, leaving the statute of frauds as a sufficient protection in other cases.

In plaintiff's brief the relations of the parties towards the land and the amusement devices are (with certain irrelevant omissions) thus fairly stated:

"The schemes were in the Coney Island Park, and there was no access to them except through the park. * * * The management of the island charged admission to the park, and reserved the right to say who should and who should not be admitted. The booths, etc., were watched and entered when occasion required by the Coney Island police. They were used by the defendant but 100 days each year. The remainder of the time they were in the exclusive possession of the plaintiff. During the entire year the plaintiff occupied the spaces underneath the roller coaster structure for piling gravel and by roadway. The electric light globes were furnished by the plaintiff for lighting, and also the electric current and water. In times of high water, the plaintiff would protect the structures and tie them down with cables. The defendant made no use of the land, and claims no right to make use of the land, for any other than the one particular purpose of running the respective amusement device on each particular spot."

The instrument before us does not purport to be what is known in common parlance as a deed, a mortgage, or a lease. The term "lease" usually implies an instrument by which the exclusive possession of land is given for a limited period. The term "deed" is usually employed to indicate an unconditional transfer of an interest in land.

Eaton v. White, 18 Wis. 543, 545; Nowlin Lumber Co. v. Wilson, 119 Mich. 406, 410, 78 N. W. 338; National Bank v. Tennessee Coal, Iron, etc., Co., 62 Ohio St. 564, 582, 57 N. E. 450; Lynch v. Moser, 72 Conn. 714, 719, 46 Atl. 153; Roberts v. Lynn Ice Co., 187 Mass. 402, 406, 73 N. E. 523. The definition of a deed as "an instrument in writing, signed, sealed, and delivered," has no application here, for there is distinct enumeration of deeds, mortgages, and leases. There is in this case no attempt to make an absolute transfer, either of the sole title or sole right of possession, of any interest in the land. Plaintiff's otherwise sole and exclusive right of possession is merely limited by a qualified and concurrent possession shared by defendant with plaintiff for certain purposes and for certain periods.

We are constrained to hold that the agreement was not within section 4106 of the Revised Statutes. It is to be noted, however, that the judgment is broader than warranted, in that it awards defendant possession in form exclusive.

[4] Does the 1906 agreement unambiguously declare the term of defendant's tenure thereunder? It was to continue as long as "the present owners continue to hold their stock," and as long as "the privileges are granted by the Coney Island Company." McIntyre and Paxton had been, in form, owners of all the stock until the making of the agreement, and Paxton at least claimed they had actually been its owners. On the other hand, the Coney Island Company claimed to own one-half the stock. However, by the settlement agreement, which spoke from its date, all parties became "present owners" of the stock. We think the contract, taken in connection with the circumstances, cannot be in this particular definitely construed, as matter of law, but that the meaning of the phrase "present owners," as intended by the parties, was for the jury; and for the purpose of aiding in this interpretation the circumstances surrounding the adoption of the phrase and out of which it grew were properly resorted to. Reed v. Insurance Co., 95 U. S. 23, 31, 24 L. Ed. 348. It was proper to receive the testimony of Brooks' contemporaneous statement to the effect that the arrangement would continue as long as McIntyre and Paxton held their stock. Gilmer v. Stone, 120 U. S. 586, 590, 7 Sup. Ct. 689, 30 L. Ed. 734; Crosley v. Reynolds (C. C. A. 6) 196 Fed. 640.

The clause "as long as the privileges are granted" is also ambiguous: (1) Plaintiff claims the meaning is "as long as these privileges are granted to the McIntyre & Paxton Company," although the latter is not named in terms: (2) defendant claims it means "as long as [any] privileges are granted out by the Coney Island Company" (for operation by concessioners, as distinguished from direct operation by the Coney Island Company); and there is the intermediate meaning (3) "as long as *these* privileges (those then held by or thereafter granted to the McIntyre & Paxton Company) are granted" (to any one, as distinguished from a direct operation by plaintiff).

We think the language of the contract does not fairly permit the second of these constructions, being the one upon which the judgment was based. The provision that defendant "shall own all of the amuse-

ment schemes as they were owned previous and run them just as they have in the past," and all the provisions of the contract taken together, satisfy us that "the privileges" referred to in the final clause relate only to the devices then being operated (or which during the term of the contract might come to be operated) by the defendant; and the testimony of Brooks' statement could not be received to vary in this respect the contract, which was to this extent unambiguous. The judgment as to the time defendant was entitled to retain possession was thus erroneous, as being too broad; and this error also directly affected the recovery of damages, because of the charge that in determining the value of the structures the length of time the defendant had the right to maintain them should be considered.

As between the first and third constructions, however, a choice must be made according to the intent of the parties. Neither construction is inconsistent with a reasonable interpretation of the language used. The evidence, taken together, did not render the ambiguity between the first and third constructions hopeless of solution. This question also was for the jury, and it had the right to whatever aid might be found in Brooks' statement (if made) that defendant could operate there so long as the Island ran or privileges were granted any one. We cannot say that the alleged assurance may not have been one of the causes inducing the making of the contract. which was one of settlement and compromise. That this alleged statement or representation was literally inconsistent with the contract, and went beyond the ambiguity which exists, and so could not have effect to its full extent, does not prevent its being admissible in solving the ambiguity to the extent we find it exists.

The uncertainty in defendant's tenure suggests serious difficulties in measuring damages, if defendant shall recover on another trial. As this subject has not been discussed by counsel, we content ourselves with this reference.

For the errors pointed out, the judgment of the Circuit Court is reversed, and the cause remanded for a new trial.