## APPEAL OF BLOSSBURG MERCANTILE CO.

Docket No. 2880.   Decided August 2, 1926.

The agreement or contract involved herein *held* to create a leasehold interest in land, and the value thereof should be included in invested capital as tangible property.

*Freeman Day*, Esq., and *Charles A. Roberts*, Esq., for the petitioner.

*A. Calder Mackay*, Esq., for the Commissioner.

Before MARQUETTE and LOVE.

This appeal is from the determination of a deficiency in income and profits taxes for the year 1920 in the amount of $3,483.22. The deficiency arises from the reduction by the Commissioner of the taxpayer's invested capital as hereinafter set forth.

### FINDINGS OF FACT.

The taxpayer is a New Mexico corporation with its principal office at Raton, N. Mex., and is engaged in the business of selling merchandise and supplies, including meats, provisions, oils, etc. Prior to the year 1905, the taxpayer maintained stores at the mines of a company known as the Raton Coal & Coke Co., under arrangements which gave it no definite tenure of its store sites and no rights at all beyond the life of the Raton Coal & Coke Co.

In July, 1905, a corporation was organized, known as the St. Louis, Rocky Mountain & Pacific Co., hereinafter called the Coal Company, which acquired all of the assets of the Raton Coal & Coke Co., and the latter company was then dissolved.

On July 26, 1906, the Coal Company and one Charles Springer entered into a written agreement, of which the material part is as follows:

WITNESSETH: That for and in consideration of the sum of One Dollar ($1.00) in hand paid by Second Party, the receipt whereof is hereby acknowledged, and in further consideration of the covenants and agreements hereinafter mentioned on part of Second Party, to be kept and performed, First Party has granted, demised and let and does by these presents grant, demise and let unto Second Party, for and during the term of ninety nine (99) years next after

the date hereof the exclusive right and privilege of selling merchandise and supplies of every kind, including meats, oil, powder and liquors, at the new Mining Camp of First Party, called Koehler or Prairie Crow Creek, and at any other Mining Camp or place within the limits of the lands now or hereafter owned or controlled by First Party, or at any Mining Camp established by First Party upon lands in which it owns the coal rights, together with the right to select and occupy from time to time such ground or real estate as he or his associates or assigns may require for buildings necessary foɪ carrying on said business, provided such ground at the time of such selection shall not be required by First Party for other use. * * * This Agreement, shall be binding upon and inure to the benefit of the successors, heirs and assigns of the parties hereto respectively.

On October 22, 1906, Springer assigned to the taxpayer the agreement of July 26, 1906, together with all rights, privileges or benefits accruing or to accrue to him thereunder, in consideration of the issue to him by the taxpayer of $410,000 par value of the taxpayer's capital stock.

On July 26, 1906, the Coal Company was, and at all times since has been, a corporation engaged in the business of mining coal upon more than 500,000 acres of land in New Mexico, owned by it in fee or in which it owned the coal rights.

Since October 22, 1920, the taxpayer has selected premises at the several mining camps of the Coal Company, and has maintained and erected buildings thereon and occupied said premises and buildings under the terms of the agreement of July 26, 1906, hereinbefore set forth.

The Commissioner and the taxpayer stipulated at the hearing that the agreement or contract of July 26, 1906, entered into by the Coal Company and Springer, was on October 22, 1906, the date when it was assigned by Springer to the taxpayer, of the value of $410,000.00.

The Commissioner, upon audit of the taxpayer's income and profits-tax return for the year 1920, determined that the rights of the taxpayer under the instrument in question are intangible property, within the meaning of section 325 of the Revenue Act of 1918, and that it should be included in the taxpayer's invested capital, subject to the limitations on intangible property provided by section 326 of the Revenue Act of 1918. He therefore reduced the taxpayer's invested capital by the amount of $231,161.64. He also made a certain minor adjustment in invested capital not material here, and determined that there is a deficiency in tax for the year 1920 in the amount of $3,483.22.

OPINION.

MARQUETTE: The question presented for determination by this appeal is whether, under section 325 of the Revenue Act of 1918,

the rights acquired under the written instrument set forth in the findings of fact are intangible property. The part of section 325 of the Revenue Act of 1918 pertinent here is as follows:

The term "intangible property" means patents, copyrights, secret processes and formulae, good will, trade-marks, trade-brands, franchises, and other like property;

The term "tangible property" means stocks, bonds, notes, and other evidences of indebtedness, bills and accounts receivable, leaseholds, and other property other than intangible property.

The taxpayer contends that the instrument in question created a leasehold or at least an interest in real estate, and that it is therefore tangible property and should be included in the taxpayer's invested capital for the year 1920 at its value at the time it was acquired, to wit—$410,000, less depreciation from the date of acquisition. The Commissioner urges that the instrument is only a license and is therefore intangible property, and should be included in invested capital subject to the limitations on intangible property provided by section 326 of the Revenue Act of 1918. The taxpayer and the Commissioner agree that the taxpayer purchased the instrument involved for $410,000 par value of its capital stock, and that at that time it had an actual cash value of $410,000.

We have carefully considered the evidence in this appeal and the arguments of counsel in support of their respective contentions as to the nature of the written instrument under consideration. We are unable, however, to agree with the Commissioner that it granted or created a mere license. On its face, it is an agreement or contract under which Springer, for a certain consideration, is given the exclusive right for a period of 99 years to sell merchandise and supplies of every kind on the lands of the Coal Company, together with the right to select and occupy such part of the Coal Company's land as he may require for buildings necessary to carry on the business of selling merchandise and supplies. Regardless of what the instrument is denominated by the parties, its true nature must be determined by looking to its terms and legal effect. *Appeal of I. Unterberg & Co.*, 2 B. T. A. 274.

We do not think it necessary here to indulge in an extended and elaborate discussion as to what constitutes a leasehold or license. It is sufficient to define them briefly; the difference between them is obvious. In Washburn on Real Property (4th ed.) Vol. 1, p. 436, it is said:

An estate for years, as understood in this chapter, is one that is created by a contract, technically called a lease, whereby one man, called the lessor, lets to another, called the lessee, the possession of lands or tenements for a term of time fixed and agreed upon by the parties to the same. By this something more is implied than a mere grant of a certain interest in land; it involves a contract, more or less explicit, as to the terms and conditions upon

which the same is to be held and managed; and this contract, in some form, is incident to every proper leasehold estate. * * * In other words, he has an *estate* in the demised premises for the term prescribed in his lease, and if deprived of the possession and enjoyment thereof, the law supplies a remedy by which he may regain these specifically, instead of recovering damages only for the violation of a contract right. * * *

A license may be defined as follows:

A license is a personal privilege, can be conferred by parol or in writing, conveys no estate or interest, and is revocable at the pleasure of the party making it. There are also other incidents attaching to a license. It is an authority to do a lawful act, which, without it, would be unlawful, and while it remains unrevoked is a justification for the acts which it authorizes to be done. It ceases with the death of either party, and cannot be transferred or alienated by the licensee, because it is a personal matter, and is limited to the original parties to it. A sale of the lands by the owner instantly works its revocation, and in no sense is it property descendible to heirs. *De Haro* v. *United States,* 5 Wall. 599.

In Thompson on Real Property (1924 ed.) Vol. 1, section 282, a license is defined as follows:

A license is a mere permission or personal and revocable privilege without the licensee possessing any estate in the land. A license passes no property in land and no interest in it. It confers a right, for instance, to go upon one's land when it would be unlawful to do so without a license. It is distinguished in this respect from an easement. While there is a distinction between an easement and a license, it is often difficult to make out whether a particular case is the one or the other. But there are certain fundamental principles underlying most of the cases, which enable courts to distinguish an easement from a license, when construed in the light of surrounding circumstances. Thus, an easement implies an interest in the land, while a license does not. An easement must be created by a writing or by prescription, while a license may be created by writing or orally. An easement is a permanent interest in the realty, while a license, at least so long as it is executory, may be revoked at pleasure.

It is apparent that the rights granted by the instrument here in question bear none of the characteristics of a license. They are not merely temporary. They are not founded on personal confidence and they are irrevocable. On the other hand, the instrument does clearly have the characteristics of a lease. It gave to Springer, and through him to the taxpayer, the right to select and occupy the lands of the Coal Company, and, after the lands to be occupied had been selected by the taxpayer, it held them in possession to the exclusion of the world, including the Coal Company. It imposes no condition upon the lessee, reserves no right to the owner of the land after the site or sites had been selected, and gives to the lessee the rights of exclusive occupation of the land for a term of years. If it had been called upon its face a lease and had demised for a term of 99 years the premises now occupied by the taxpayer with the exclusive privilege of carrying on a mercantile business, the taxpayer would not

have acquired the rights in any way greater than or different from the rights it has acquired under the instrument involved herein.

There are numerous decisions of the State and Federal courts which have a bearing on the question here presented, only a few of which will be referred to. These decisions confirm and substantiate our opinion that the written instrument involved in this appeal created a leasehold and not a mere license. In the case of *United States* v. *Gratiot*, 14 Pet. 526, the facts were that the United States was the owner of certain lead mines located in the Indian Territory, and under the Act of March 3, 1807, authorizing him to lease these mines for not to exceed five years, the President, acting through the Secretary of War, entered into a "license for smelting" with P. B. Gratiot and Robert Burton whereby they were given the right—

To purchase and smelt lead ore, at the United States' lead mines, on the upper Mississippi, for the period of one year, from and after the date hereof, upon the following conditions, viz: 1. All purchases, or other acquisitions of ore, ashes, zinc or lead, to be from persons authorized to work the mines, either as lessees, smelters or diggers, and from no others; and no ore to be purchased from the leased premises of any person, without his permission. 2. To commence smelting as soon as 100,000 pounds of ore are obtained, and to continue it so long as any is on hand; to weigh a charge of ore for the log furnace, and the lead produced from it, when required to do it by the said first party or his assistant. 3. To keep a book containing an accurate account of all ore, ashes or zinc purchased, or otherwise acquired, and of all lead manufactured; which book shall, at all times, be open to inspection of the said first party or his assistant; and to furnish a transcript or return at the end of every month, agreeably to a form furnished by the said first party; which book and returns to be verified, on oath, if required. 4. The said second party hereby agrees to pay the first party, for the use of the United States, six pounds of every hundred pounds of all the lead smelted by him, under this indenture, to be paid monthly, in clear pure lead, at the wareroom on Fever River, or at such other place near the mines as the said first party shall direct, and free of expense to the United States. And the said second party is not to sell, or remove from the place of smelting, in any manner whatever, any lead, until the rent be paid as aforesaid. This condition is subject to the revocation of the government, upon giving three months' previous notice; at which time, it will be optional with the licentiate to accept or refuse the new terms. Upon his refusal to accept, then this license shall cease and determine. 5. The second party is allowed to have as much fuel as will suffice, without waste, for the purpose of this indenture, and to cultivate as much land as will suffice to furnish his teams, &c., with provender.

The question arose as to whether or not the President had the power under the Act of March 3, 1807, to make the contract set forth. The Supreme Court of the United States held that the contract was a lease, which the President was authorized to make under the Act of March 3, 1807, saying:

Does, then, the contract upon which the present action is founded, fall within the authority given to the president to lease the lead-mines? Or, in other words, is this contract a lease, within the meaning of the law? In con-

struing this contract, the bond, and what is called "the license for smelting," are to be taken as part of the same instrument; and purport to have been made with the defendants, with T. C. Legate, superintending the United States' lead-mines, acting under the direction of the secretary of war, who must be presumed to be acting under the authority of the president; especially, as the permission given by the contract, in terms, is said to be by and with the appropriation [sic] of the president of the United States. This contract purports to be a license for smelting lead-ore; and it is objected, that this is not a lease, within the meaning of the act of congress. But this objection is not well founded. It is a contract for one year, and of course, within the time limited by the law, which gives to the president authority to lease for five years. Is it, then, a lease? The legal understanding of a lease for years is, a contract for the possession and profits of land, for a determinate period, with the recompense of rent. The contract in question is strictly within this definition. The business of smelting is a part of the operation of mining, although it may be a distinct branch from that of digging the ore; but the law ought not to be so construed as to require the whole operation to be embraced in the same contract. They are different operations, requiring different qualifications and distinct regulations. This contract is for the possession of land. The work is to be performed at the United States' lead-mines, and must, of course, be performed within the limits prescribed by law to be attached to such mines. And there is an express permission to use as much fuel as is necessary to carry on the smelting business, and to cultivate as much land as will suffice to furnish teams, &c., with provender; and there is an express reservation of the rent of six pounds of every hundred pounds of lead smelted, with special and particular stipulation for securing the same. It is not necessary that the rent should be in money. If received in kind, it is rent, in contemplation of law.

In the case of *Mehlman* v. *Atlantic Amusement Co.*, 119 N. Y. S. 222, a situation was presented which is very similar to that in the instant appeal. In that case the defendant, by an instrument in writing designated as a lease, contracted with plaintiff to " let " to plaintiff, who agreed to " take " from defendant, " all that certain right or privilege to maintain three stands in Steeplechase Park, Coney Island, N. Y., for the sale of all kinds of candies, peanuts, and popcorn, the said right being the exclusive right for said business within Steeplechase Park from the beach to Surf Avenue; also, in addition, the storeroom under the Steeplechase tracks, and one of said stands to be located in the main pavilion of Steeplechase Park, as already designated, and its size not to exceed 8 x 8 feet." The period of such " letting " was to be from the opening day of said park to the 1st day of October, 1907, at a " rent " of $1,200, payable $600 on the signing of the instrument, $300 on June 15, 1907, and $300 on July 5, 1907. Plaintiff took possession and made the payments above mentioned. The last of such payments was made on July 5, 1907, which was in full for the whole season. Thereafter, and on July 28, 1907, the entire park was destroyed by fire, and the plaintiff sued to recover that proportion of the said " rent " of $1,200 which would cover the period subsequent to July 28, 1907, and be-

tween that date and October 1, 1907, when the lease by its terms was to terminate. The Municipal Court for the Borough of Manhattan, Second District, held that the instrument involved was a license. An appeal was taken to the Supreme Court which reversed the judgment of the Municipal Court and held the instrument to be a lease. The Supreme Court in that case said:

Was the instrument a lease or a license? If it was a lease, the rent due and owing, and paid on July 5th, can not be recovered, notwithstanding the destruction by fire on July 28, 1907. The test of the distinction between a lease and a license depends, substantially, upon the question whether or not the contract or authority granting the right to enter upon the land of another confers upon the person so entering an interest in the land, so as to affect the other in the exclusive use of his land. While it is true that the mere use of the words "lease" and "let" in the contract does not necessarily create a lease, as distinguished from a license, nevertheless the instrument in suit must be regarded as a lease, since it gave plaintiff the right to the possession and use, not only of a certain specified space of ground for his stands, but also of the storeroom under the tracks, which right of use and possession certainly affected defendant's right to the exclusive use of its land. We are of opinion, therefore, that the learned court below fell into error in holding that the instrument was a license, and not a lease.

In the case of *Coney Island Co.* v. *McIntire-Paxton Co.*, (C. C. A.) 200 Fed. 901, plaintiff owned and conducted an amusement park in which the defendant operated certain devices, paying the plaintiff a percentage of its earnings for the privilege. In settling a disagreement between them, a contract was made by which the defendant transferred to the plaintiff a part of its capital stock and other property. The contract also provided that the defendant should own and operate the devices as previously, and on the same terms as to percentage "as long as the present owners continue to hold their stock and the privileges are granted by the Coney Island Company." The plaintiff brought suit to recover possession of those portions of its premises on which stood the amusement devices owned and operated by the defendant. The United States Circuit Court of Appeals, Sixth Circuit, held that the contract involved was not a mere license revocable by the plaintiff at its pleasure, but that it gave the defendant a certain interest in the qualified use and possession of the land. The court said:

Was the agreement, so far as it attempted to give defendant a right to occupy plaintiff's land, merely a revocable license? As said in *Morrill* v. *Mackman,* 24 Mich. at page 282, 9 Am. Rep. 124;

"A license is a permission to do some act or series of acts on the land of the licensor without having any permanent interest in it. * * * It is founded on personal confidence, and, therefore, not assignable. * * * It may be given in writing or by parol; it may be with or without consideration: but in either case it is subject to revocation, though constituting a protection to the party acting under it until the revocation takes place. Where nothing beyond

a mere license in contemplated, and no interest in the land is proposed to be created, the statute of frauds has no application, and the observance of no formality is important. But there may also be a license where the understanding of the parties has in view a privilege of a less precarious nature. * * * Wherever, in short, the purpose has been to give an interest in the land, there may be a license; but there would also be something more than a license, if the proper formalities for the conveyance of the proposed interest have been observed. What that interest shall be called in the law may depend upon the character of the possession, occupancy, or use the promisee is to have, the time it is to continue, and perhaps upon the mode in which the compensation, if any, is to be made therefor."

* * * We think it a misnomer to call the agreement before us a mere license. As construed below, it was not intended to continue merely at the will of the plaintiff. It recognized an interest in defendant in the qualified use and possession of plaintiff's land. It was intended to constitute a limitation upon plaintiff's sole use and possession of its land, so far as inconsistent with defendant's qualified and concurrent right of possession, and to the extent necessary for the performance of the contract. It was not for an indefinite or permanent term, in a strict sense, but was to continue during a period whose limits were determined, although as yet uncertain in years. It pertained to the use of personal property, in whose beneficial use, plaintiff was directly interested. It provided for action to be done on plaintiff's land for its benefit, not merely to be derived from its interest in the defendant, but through compensation to be paid directly to plaintiff for right to so operate. The defendant, moreover, as well as the plaintiff was under express obligation to perform it. Such rights, we think, (if effectively conveyed) amount to an interest in the land, as distinguished from a mere license. * * *

We are of the opinion that the written instrument involved in this appeal created, among other things, a leasehold, and not a mere license. Under the provisions of section 325 of the Revenue Act of 1918, a leasehold is tangible property. It therefore follows that, under the assignment to it by Springer of the written instrument, the taxpayer acquired tangible property, and it should be treated as such in computing invested capital.

> *Order of redetermination will be entered on 15 days' notice, under Rule 50.*

LITTLETON and PHILLIPS dissent.