CAMERON MILL & ELEVATOR CO. v. CHAS. F. ORTHWEIN'S SONS.

(Circuit Court of Appeals, Fifth Circuit. February 10, 1903.)

No. 1,162.

1. CONTRACTS—ISSUE AS TO CONSTRUCTION—ADMISSION OF PAROL EVIDENCE.

In an action on a contract embodied in writings, where there is a controversy as to whether certain words used are ambiguous and unintelligible, such construction is a matter to be determined by the court as one of law, and, if it determines that the words are not ambiguous, parol evidence is not admissible to show the understanding of either party as to their meaning, nor to vary or contradict them, although the court may, on the issue as to ambiguity, hear parol evidence to throw light upon the collateral facts and circumstances; but when the court admits testimony of a contradictory character as to the meaning of the words, in view of the circumstances under which they were used, the question becomes one for the jury, and the burden rests upon the plaintiff to establish his contention as to their meaning by a preponderance of evidence.

2. SAME—DELIVERY UNDER CONTRACT OF SALE—QUESTION FOR JURY.

Plaintiffs contracted with defendant verbally, at Ft. Worth, Tex., for the purchase of a quantity of wheat. Each party wrote a letter to the other, confirmatory of the oral contract, and each stating the price and quantity, and that the wheat was to be "delivered Galveston." Plaintiff's letter stated, in addition, that the purchase was by Galveston weight and grades, and contained direction for shipment from Ft. Worth, where the wheat was then stored. Defendant shipped the wheat, and plaintiffs paid for the same on presentation of the bill of lading. The wheat arrived at Galveston, and, while still in the cars, was damaged by the great storm. Plaintiffs sued for damages, alleging that the contract required the wheat to be delivered into the elevator at Galveston, and that title had not passed at the time of the damage. *Held*, that the words in the letters, "delivered Galveston," without other language explanatory, could not be construed, as matter of law, to require delivery into the elevators at Galveston, and that, the testimony as to the terms of the oral contract being contradictory, the construction of the contract in that respect was a question for the jury.

In Error to the Circuit Court of the United States for the Northern District of Texas.

S. B. Cantey and R. W. Flournoy, for plaintiff in error.

W. P. McLean and F. Charles Hume, for defendants in error.

Before PARDEE and SHELBY, Circuit Judges, and BOARMAN, District Judge.

BOARMAN, District Judge. Orthwein's Sons, citizens of Missouri, dealers in and exporters of grain—their immediate place of business being at Ft. Worth, Tex.—were the plaintiffs below; and the Cameron Mill Company, receivers, shippers and dealers in grain in the same place, called in the briefs the "Mill Company," were the defendants below. It will be sufficient for our present purposes to state the cause of action to be as follows: Orthwein's Sons allege that the mill company on August 19, 1900, sold, under two different contracts of sale (5,000 under each contract), 10,000 bushels of wheat of a certain quality, under conditions and mutual understandings which show an executory contract—a contract which did not become executed or vest title in the thing sold in Orthwein's Sons unless

and until it (the wheat) was delivered to them after inspection, grading, and weighing thereof, according to Galveston inspection grades and weights, into the elevator at Galveston; that the mill company, because of its default and failure to perform its part of the contract, became ultimately indebted to them in the sum of $3,715.61. The mill company rest their defense on the ground that the said contract of sale vested title to the wheat in Orthwein's Sons; that the delivery and shipment from Ft. Worth of the wheat were made by the mill company as bailees of the purchaser thereof, according to mutual understandings and obligations of the sellers and buyers, and if said wheat, after its delivery at Ft. Worth, was in fact damaged by the Galveston storm, or otherwise, the title thereto having passed out of the sellers to the buyers, the mill company is not liable for such damages. Orthwein's Sons, contending that the delivery of said wheat was to be made into the elevators at Galveston, sought to show and recover on an executory contract which, in its essential elements, had been defaulted on by the mill company. In these contentions inhere the issuable matters of fact and law material in this case, the trial of which resulted, on an affirmative charge of the Circuit Court, in a judgment for the defendant in error for $3,771.04.

The record shows 10 assignments of error on behalf of the plaintiffs in error. The first assignment of error charged against the trial court is because of its refusal to admit a part of McLellan's evidence relating to his understandings of the meaning of certain words and phrases relating to place of delivery appearing in the letters now in evidence, which letters plaintiffs in error contend are ambiguous and incomplete in their meaning, and do not show a mutual understanding that sellers were to deliver wheat into the elevator at Galveston. The several other assignments, relating, as they do, to the refusal of special instructions, challenge, substantially, the Circuit Court's affirmance of the contention of the defendants in error to the effect that, under the terms of the contract of sale, the title remained in the mill company, and the said company bound itself in the contract of sale to deliver the wheat to Orthwein's Sons "in the elevator at Galveston," and may be taken up later, and disposed of in considering the charge of the Circuit Court. The Circuit Court's charge is as follows:

"* * * It appearing to the court that the law is for plaintiff, the court so announced, and instructed the jury to find for plaintiffs the amount of the difference between the sums paid by plaintiffs to defendant for the wheat in controversy, and the value of said wheat at the time same was delivered to plaintiffs in the elevators at Galveston, together with the expenditures made by plaintiffs for handling and preserving the wheat before it went into said elevators. * * *"

Considering the first assignment of error, it appears that plaintiffs in error, refusing to be held to an acquiescence in the interpretation which the defendants in error sought to put upon the contract of sale, offered to show by McLellan how he himself (he having negotiated the sale over the phone with Orthwein's Sons' agent, Mountcastle) understood, on his reading of buyers' letters, the sellers' obligation as to the matter of delivery. He was asked to read Orthwein's Sons' letter, and say what he understood—that is, what is the meaning of

the statement, "We confirm purchase from you to-day" of so many bushels of wheat "at 70½ delivered Galveston, Tex." We recite here two of the confirmatory letters; the other two, relating to the other 5,000-bushels deal, being, except as to price, substantially similar:

"Fort Worth, Texas, Aug. 29, 1900.

"Mess. Cameron Mill & Elev. Co., Fort Worth, Texas—Dear Sir: We confirm purchase from you to-day of —— cars, 5,000 bushels, No. 2 red wheat, new crop, at 70½ delivered Galveston, Tex., —— f. o. b. shipment within 10 days. Delivery at —— by Galveston, Tex., weight and grades. Ship to Galveston, care Texas Star Mills Elevator, and don't fail to note on B. L. 'For Export.' Make draft on us B. L. attached, at Fort Worth, Texas, leaving fair margin. Exchange to be paid by shipper. All cars must be loaded to capacity.

"In reference to this purchase please use Contract No. 897.

"Yours truly, Chas. F. Orthwein's Sons per Butts.

"No. 3 wheat, 59 lbs. 1c off, and 1c additional for each pound below 57."

"Cameron Mill & Elevator Co. High Grade Flour and Meal.

"Fort Worth, Texas, Aug. 29th, 1900.

"C. F. Orthwein's Sons, City—Dear Sirs: We beg to confirm our sale to you over phone to-day of 5,000 bushels of No. 2 red wheat at 69½ cents per bushel and 5,000 bushels at 70½ cents per bushel, delivered Galveston.

"Yours truly, Cameron Mill & Elevator Co.,

"Per McLellan."

This record shows a case which resolves itself, on writ of error, into the question as to whether any issuable matters of fact are disclosed therein which should have been submitted to the jury. Several issues of law are presented by counsel on either side, illustrating their contentions as to the first assignment of plaintiff in error. Under our view of the case, it seems necessary to consider two issues of law: First. The legal question as to whether or not the language and phrases of the letters relied upon by the buyers to show an aggregatio mentium of the parties on the place for the delivery of the wheat, when read between their four corners, are ambiguous and incomplete. Second. Should the letters, in considering McLellan's rejected testimony, be treated as written instruments intended by their authors, respectively, not to reduce to writing all their understanding as to the essential elements of the verbal contract of sale made over the phone, but to add confirmation thereof, with supplementary instructions, in which both parties had already primarily concurred as to matters which may necessarily enter into in whom the title vested when the damaged wheat was found after the storm at Galveston.

It was competent for the parties to make a verbal contract of sale of either an executory or an executed character. The agents of the parties, as witnesses on either side, agree in saying a contract of sale was made and completed on parol negotiations and understandings had over the phone. Conceding that the sale was made verbally, an agreement as to the thing sold, the price, and consent, presumably, was understood by the parties, and this sale could have been enforced at the instance of either in the absence of these letters. In that case the matter of delivery would have been supplied by a presumption of law. Presumably, the two letters were written by the authors thereof, respectively, in their offices at Ft. Worth. Nothing in the evi-

120 F.—30

dence appears to warrant us in saying which of the two letters was first written, or first reached the addressee. Neither of the letters propounds a proposition to buy or sell wheat, nor were the authors thereof discussing a new or another contract of sale. It seems that both parties, being content to stand on the parol sale, adopted such commercial methods of confirming the sale as may be customary with such dealers. Plaguing difficulties like those presented in these skeleton letters are often imposed on trial courts, when traders, trusting their ventures to the vagaries of such hastily formed commercial instruments, find it desirable, after the unforeseen happens, and losses to either side follow, to invoke the courts to determine for them, from enigmatical contracts, made up of such letters, where or in whom was the title and risk when the loss was incurred. We are not impressed by the vague language of these letters, nor by the want of words which seem necessary to clothe the skeleton, or fill the blanks with sentient thought, with the presumption of fact that their authors respectively intended, or were endeavoring to reduce, concretely, to writing, or even to state intelligibly, all the understandings which they had with each other in making the verbal contract of sale. If these letters, taken together, and read between the four corners, show, manifestly, the consent and purpose of both parties that the sale should be completed only when the wheat is delivered "into the elevator at Galveston," then the instruments, being free from ambiguity, were rightly construed by the trial judge. The record shows that, before objection appears therein to McLellan's testimony, he and several other witnesses on either side had given evidence, more or less contradictory of each other, responsive to the line of inquiry which was later on forbidden as to him. McLellan had already repeated the verbal negotiation which he and Mountcastle had, in making the contract over the phone, as to his understanding of the essential elements of the sale. Among other things, McLellan contradicted some of the material statements of the witness Mountcastle in relation to a conversation over the phone between himself and Mountcastle as to the delivery of the wheat in question. McLellan says:

"I called Mountcastle over phone. After some talk, I accepted a price of 69½c., 70½c. at Galveston on basis No. 2 red. I was to pay the freight. I heard Mr. Mountcastle's deposition read as to our conversation about delivery, and he is mistaken."

Further testifying, McLellan said, after the full purchase price was paid, and the bills of lading were turned over to the buyers, the wheat which was in the elevator at Ft. Worth was then shipped to Galveston "as per instructions given to me." It does not appear how these instructions were given to him. Presumably, he meant, in using the words quoted, that the sellers' letters were or should be construed as giving him instructions as to delivery and shipment of the wheat, or it may be that he had received in some other way verbal instructions as to such material matters. Much of the evidence appearing in the record seems to be historical, as to things which occurred after the cars, with the wheat, left Ft. Worth, yet some of the evidence went, in its effect, whatever may have been apparently the

purpose of it, to illustrate contradictorily the material issues of fact tendered in the pleadings on either side. Other evidence showing how the buyers acted in relation to the damaged wheat, and tending to show upon whom they thought the loss would fall, would have been valuable to the jury, to show them where the buyers themselves thought the title rested when the storm damaged the wheat in the railway yards at Galveston—notably, the evidence of C. A. Orthwein and others, who told of matters occurring in Galveston, would have been persuasive as to where it was thought by him, and others acting for him, the title then rested. Something illustrative of that issue, or as to how the buyers regarded the title and risk, may be gathered, too, from the readiness with which he (Orthwein) followed and found the damaged cargoes of wheat at Galveston, and from the zealous and solicitous care which he gave to it at a time when, as the results of the storm, widespread desolation and commercial ruin on every hand were still appalling the panic-stricken survivors of the great storm at Galveston, who were yet in the presence of thousands of their unburied dead. Besides this, something as to where the buyers thought the title rested may be suggested by the fact that the buyers received the bills of lading and paid in full for the wheat at Ft. Worth, notwithstanding it appears from their letters that they instructed the sellers, in drawing on them, to leave a fair margin in the amount of the draft to be drawn on them, apparently, to protect the buyers on any reclamation claims they might have for failure of the sellers to comply with conditions of the contract of sale. In addition to this, it may be a suggestive fact as to the matter of title to know that, presumably, the buyers themselves did not feel assured as to in whom the title rested until they were advised by counsel some days after the wheat had, by their zealous care, been placed in the elevators, that the risk was in the sellers when the wheat was damaged. Mountcastle himself says, "It was stipulated in the verbal contract of sale that the wheat was to be delivered at Galveston." He further says: That the grade of wheat was ascertained by a grain inspector of the inspection department at Galveston under the supervision of the cotton exchange, and the weight was ascertained by a sworn weigher. That in purchasing wheat for plaintiffs a price would be fixed for a grade of No. 2, with fixed discounts for wheat not termed "off grade." It was customary for plaintiffs to accept wheat grading below No. 4 when it was merchantable, and would be unloaded in the elevator by the elevator people at Galveston. That final settlements were made between buyer and seller on such inspections and weight. Further, on cross-examination, he said that McLellan told him when the trades were made that he would sell No. 2 wheat, but did not know what the grade would be at Galveston, but would accept and make final settlement on Galveston weights and grades; stating at the time that he would very much prefer that Ft. Worth inspectors inspect the wheat at Ft. Worth. This last proposition of McLellan's he declined. Orthwein, witness, knew nothing of the particulars of the transaction over the phone. He says it is not customary for the carrier to deliver grain anywhere in Galveston but in the elevators. This was export grain. "We

never received car locally at Galveston." Neither of these witnesses make it clear in their testimony that there was anything in these contracts of sale to show that the sellers in this case knew of such a custom of the carriers, or agreed to deliver the wheat into the elevators at Galveston according to such a custom. On the matter of delivering wheat for export into the elevators at Galveston, it seems clear enough that the custom of the carrier was, after a car load of wheat for export came to the railway yards, to remove it to the elevator, for which moving a special trackage charge was made; but it may not follow, as a matter of course, that the dealers in wheat at Ft. Worth buy and sell wheat with a view to such custom of the carriers, though it may appear from the evidence that traders in wheat in Galveston understand the custom is for export wheat to be delivered into the elevators.

We make cursory reference to such contradictory evidence, not with a view of stating rules of law with which to test the passing of title from the seller to the buyer on a given state of facts—such issues of law are not now considered by us—but only to suggest that so much of it as we have referred to was largely surplusage, unless it was the purpose of the trial court to submit to the jury the issue of fact as to in whom title to the wheat rested when it was damaged. It seems that the trial judge was of opinion that these letters were intended by the parties to be, concretely, the repository of all their understandings as to the essential elements of the contract. On such a view of the state of case, much of the parol evidence as to delivery was not admissible. It seems, too, to have been thought by him that there was no conflict apparent in the evidence, which seemingly was admitted to illustrate the subject-matter and material incidents of the contract of sale, and the intention of the parties on the matter of delivery; that the letters, being free from ambiguities and incompleteness, clearly enough, on reading the same between the four corners thereof, showed that the parties intended that title should remain with the sellers until they had delivered the wheat "into the elevators at Galveston." Whether this view of the trial judge is well taken or not, we think, on the state of facts already disclosed at the time the case was withdrawn from the jury, that it should have been submitted to the jury for a verdict on such contradictory evidence as appears in the record.

Whether the language used in a contract is ambiguous or incomplete is a question of law, for the court. We think these letters were ambiguous and incomplete, if not absolutely obscure in surplusage of words, as well as in the absence of words which seem necessary to intelligibly fill the blanks and places where no words appear. In either of the confirmatory letters is found the words "delivered Galveston." Taking these words as they are related to and appear in the context in either letter, it does not follow manifestly that both authors gave, or intended to give, the same meaning to the phrase. The buyers contend that these words, together with the context of their letters, mean that the sellers promise to deliver the wheat at Galveston into the elevators. The sellers contend that the words "delivered Galveston" relate to a net price of 70½ cents per bushel

at Galveston, and the language "delivered Galveston" does not show a promise on their part to deliver wheat into Galveston elevators. The sellers write: "We beg to confirm our sale to you over phone to-day of 5000 bushels * * * at 70½ cents per bushel delivered Galveston." This letter is limited to a confirmation of the sale made over the phone. It purports an acquiescence only in all the terms of the sale made over the phone. Reading it between its four corners, it does not manifestly purport an acquiescence in all the terms and conditions shown in the buyers' letter. Taking this letter by itself, as if no letter had been received from the buyer, it might be difficult enough to understand just what was meant by its author in the use of the words "delivered Galveston." Taking the letters of the buyers and sellers together, the difficulty appears to be much intensified. The words "delivered Galveston" are not technical words. They do not manifestly or presumably show that one party understood them as the other did. The words "delivered Galveston, Texas," appearing in the sellers' letters, when taken with the other words and blanks which make up the context of the several letters, are ambiguously obscure in their meaning. The buyers insist that the sellers shall acquiesce in the meaning which they give to these words. The letters of both parties, taken together, are ambiguous on the pivotal issue as to where the sellers promise to deliver the wheat. Taking the two letters together, and limiting the reading thereof to the four corners, we are unable to follow the line of reasoning which led the learned trial judge to the conclusion that the sellers promised to deliver wheat "into the elevators at Galveston." On this view, it seems that extrinsic parol evidence which might clear up the meaning and intention of the parties as to the delivery of the wheat should have been admitted, and the issues thereon submitted to the jury. The state of case when it was withdrawn from the jury showed manifestly that such evidence, if offered by either side, could have been legally admitted to show whether or not the sellers promised, in the letters or otherwise, to deliver the wheat into the elevator at Galveston.

Regarding the first assignment, it appears, under the rule of parol evidence, that neither party to written instruments intended to embody all the understandings of the parties as to the essential elements of a contract may be heard as a witness to show, as against the other party, what he himself intended to be, or should be, the meaning of certain ambiguous words therein. Greenleaf, vol. 1; page 406, notes. It may be that to admit McLellan's evidence over the objection urged in the trial court would be trenching too closely on the rule of evidence which we have just suggested. If the letters relied on by the sellers to show the place of delivery are, because of these ambiguities, not intelligible on that issue, the common-law rule would authorize the presumption that the parties intended to have delivery made at Ft. Worth. If there was a suspensive condition as to title resting in the matter of delivery, then either party may avoid the effect of the legal presumption just stated by administering parol evidence to show how and when such a suspensive condition was to be performed by the seller. The rule of evidence applicable to such a state of case, stated substantially, is, if the contention is that

certain words or phrases relied upon by either party to a contract to show an aggregatio mentium on an essential element of a sale are ambiguous and unintelligible on that issue, such contention as to ambiguity is a matter of law, for the court. If the words, in the opinion of the court, are free from ambiguity, no parol evidence is admissible to show how either party understood them. They are bound by them as the court interprets them. Nor is such evidence admissible to vary or contradict them. When there is a contention as to whether certain words in an instrument are ambiguous, as in this case, the judge may hear parol evidence to throw light on collateral facts and circumstances. Greenleaf, vol. 1, page 427. But if the court admits testimony of a contradictory character as to the meaning of the words in question, then it seems clear enough that the party seeking to hold the other to acquiescence in his interpretation of such words must, by a preponderance of proof, make clear to the jury what the words really mean as between the parties. To aid the jury in such an issue, either party should be permitted to show by parol evidence anything which may tend to show usage respecting the subject to which the contract relates; to show how and under what understandings as to trade customs at Ft. Worth others engaged in similar transactions traded in wheat at Ft. Worth; to show by any other evidence as may assist the court and jury in placing themselves, in regard to surrounding circumstances, as nearly as practicable in the situation of the parties whose written instruments are to be construed—the question being, what did the parties thus circumstanced mean as to the matter of delivering the wheat sold over the phone? We think there was error in not submitting the case to the jury on issuable matters of fact upon which the record shows there was conflicting evidence.

For the foregoing reasons, the judgment of the Circuit Court is reversed, and the cause is remanded, with instructions to award a new trial.