**UNITED STATES v. LUNDSTROM et al.**

**LUNDSTROM et al. v. UNITED STATES.**

No. 10322.

Circuit Court of Appeals, Ninth Circuit.

Dec. 20, 1943.

of Portland, Ore., for appellant the United States.

Cheney & Hutcheson, Joseph C. Cheney, Elwood Hutcheson, and John Gavin, all of Yakima, Wash., and Bischoff & Bischoff and S. J. Bischoff, all of Portland, Ore. for appellant Lundstrom et al.

Before GARRECHT, STEPHENS, and HEALY, Circuit Judges.

STEPHENS, Circuit Judge.

For the period herein concerned John G. and W. B. Lundstrom constitute a copartnership under the firm name and style of Western Auto Express. The copartners as plaintiffs in the district court were awarded a money judgment against the United States under the Tucker Act of March 3, 1887, c. 359, 24 Stat. 505, Title 28 U.S.C.A. Sec. 41(20), for the reasonable value of services performed under a contract. The United States, defendant below, appeals claiming that nothing is owing to plaintiffs, and the plaintiffs appeal claiming that the award, under the evidence, should be larger.

The defendant below and the plaintiffs below are designated as appellants and appellees, respectively in the briefs, but we think it more understandable to refer to the plaintiffs below, who are both appellees and cross-appellants here, as Lundstroms and to the defendant below, which is both appellant and cross-appellee here, as United States or as the government.

The District Quartermaster, Civilian Conservation Corps at Vancouver, Washington, mailed to Lundstroms and others a written invitation for bids for "Commercial hauling of C.C.C. Camp Buildings" from various places to other localities. There is a note to the specification furnished the bidders as follows: "The above supplies are composed of about 75 Ton of Lumber (Portable Knocked Down buildings and building material) and about 200 Ton of Lumber for each shipment." Lundstroms' bid was accepted, and they entered upon the performance of the contract.

One of their truck men who was assigned to the job promptly informed them that the whole job consisted of hauling knocked down sections of C.C.C. houses located in out-of-the-way places and that there was no lumber to haul as the word "lumber" is customarily understood. There seems to be no controversy over the asser-

GARRECHT, Circuit Judge, dissenting.

Carl C. Donaugh, U. S. Atty., and William H. Hedlund, Asst. U. S. Atty., both

tion of Lundstroms that the hauling of this sort of material is much more expensive than ordinary lumber. The compensation for hauling was fixed by the contract upon a base payment per hundred weight which covered both lumber and knocked down sections of houses. Upon learning the nature of the materials Lundstroms promptly notified the Quartermaster, but the latter refused to consider any adjustment. The evidence seems to establish that the official bruskly demanded full and prompt performance of the contract upon the penalty of having private trucks employed and charged to Lundstroms' account and upon threats to withhold payments including due payments from other jobs.

Lundstroms were not financially able to weather these penalties and threats so proceeded to perform the service, protesting, however, that the nature of the materials was not in accord with specifications. The contract provided for progress payments. Accordingly, vouchers were regularly made out upon government blanks, forwarded to the government and honored by it. It will be important to note that the vouchers contained the following printed statement upon their faces. "I certify that the above bill is correct and just and that payment therefor has not been received." It may be well, too, at this junction to recite that the invitation to bid and the ensuing contract contained the following provision: "It is the duty of each prospective bidder to familiarize himself with all the terms and conditions of this proposal and satisfy himself completely before submitting his bid. All prospective bidders are invited to consult with the District Quartermaster, C.C.C. Vancouver Barracks, Washington, for any information desired." The contract also contained a provision for referring disputes and a provision for "Variation of Quantities," both of which we shall discuss later.

After the hauling had been completed and payment had been fully made as provided in the contract, Lundstroms brought suit upon the contract claiming, however, that the variation of the material as above indicated had greatly increased the cost of handling it and demanded judgment upon the quantum meruit value of the services less the sums already paid.

It is not seriously contended by the government that in ordinary parlance knocked down sections of houses would be classed as lumber. It does claim, however, that a directive was shown Lundstroms before the contract was entered into to the effect that such material is classed as lumber and further that the bidding rules required them to familiarize themselves with the terms of the proposal. (The full provision on this point has already been set out.)

As to the directive it is sufficient to say that the evidence is completely conflicting as to whether or not it was ever seen by or called to the attention of Lundstroms. The court found that Lundstroms knew nothing about the directive, and we cannot disturb this finding. The court also found against the contention of the government that the requirement regarding the bidder's duty to familiarize himself etcetera assists it. The representation as to materials were clear, and Lundstroms had a right to rely upon them. There is no claim as to the condition of the materials or as to any other situation out of the normal. As was said in United States v. Utah, Nevada & California Stage Co., 199 U.S. 414, 26 S.Ct. 69, 73, 50 L.Ed. 251, in referring to the necessity of the bidder's making investigation beyond the government representations: "We do not think, when the statement was thus unequivocal, and the document was prepared for the guidance of bidders for government service, that the general statement that the contractor must investigate for himself, and of nonresponsibility for mistakes, would require an independent investigation of a fact which the government had left in no doubt." Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898. See Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933; Freund v. United States, 260 U.S. 60, 43 S.Ct. 70, 67 L.Ed. 131.

The latter case is authority also for the proposition that the acceptance of payments as the work progresses under a comparable provision does not preclude additional recovery upon the quantum meruit. We shall therefore not further notice the government's claim that this is an action in tort and therefore not within the purview of the Tucker Act.

In connection with the acceptance of progress payments and the printed statement that the amount stated upon the voucher is correct and just and not already received we consider the government's claim that the facts constitute an accord and satisfaction. We think the essentials of an accord and satisfaction are

not present, but we are not required to go that far. There can be no doubt that the issue of accord and satisfaction must be pleaded, and this issue does not appear in the case, so far as we have seen, until it is argued in the government's opening brief.

Furthermore, there is no substantial evidence in support of acquiescence by Lundstroms. The protests were in effect continuously. See St. Louis, Brownsville & Mexico R. Co. v. United States, 268 U.S. 169, 45 S.Ct. 472, 69 L.Ed. 899.

The contract contains the following provision:

"Special Instruction to Bidders

"Disputes: Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer, subject to written appeal by the contractor within thirty (30) days to the head of the department concerned or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the contractor shall diligently proceed with performance."

■ It is the position of the government that this provision covers the dispute over the description of the materials to be hauled, that it was the duty of the Lundstroms to follow the procedure therein, and that the district court was without jurisdiction of the subject matter. But, if this were true, the very untenable and paradoxical situation would be present that the government, one of the parties to the contract, would have the decision as to the meaning and extent of its contract. Provisions such as here under consideration do not relate at all to the interpretation of the contract. Issues so arising are strictly issues of law and are for the courts to determine.

Although we do not cite it as controlling authority, we think the correct principle is concisely stated in Rust Eng. Co. v. United States, 86 Ct.Cl. 461. "It will be seen, therefore, that this item of plaintiff's claim was denied upon the construction of the contract rather than upon the facts. It is clear that the court is not deprived of jurisdiction to consider the claim. Appeals were necessary under the contract only on disputes concerning questions of fact, and there was here no controversy as to the facts." Cf. Haskell v. McClintic-Marshall

Co., 9 Cir., 289 F. 405, 409. See Davis v. United States, 82 Ct.Cl. 334; Donnelly on the Law of Public Contracts, page 349.

The government cites three cases as authority for its position on this issue, none of which, in our opinion, is in point:

Leebern v. United States, 5 Cir., 124 F. 2d 505. The litigant in this case was denied a review because he did not follow the administrative provisions of the Alcohol Tax Unit.

Plumley v. United States, 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342. A construction contract provided for a certain procedure in the case in which extras were added. No question arose as to the additions being extras. Recovery was denied upon the ground that the procedure provided was not followed.

Myers v. Bethlehem Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638. In this case it was held that an administrative remedy must be exhausted before applying to the courts for relief.

In none of these cases was there an issue upon the proper interpretation of a contract. The provision in the contract covering "disputes" in the instant case is in no sense a statutory administrative remedy, and cases turning upon provisions of this nature have no relevancy to the question under consideration.

The following provision is in the contract: "6. Variation in Quantities: The government reserves the right to order more or less than quantities specified, provided the difference shall not exceed 25%." It will be recalled that the contract rate for hauling is a single flat per hundred pound rate inclusive of both lumber and knocked down material.

■ As heretofore stated we think Lundstroms had a right to recover upon a quantum meruit basis, but it appears to us that the parties contracted in the knowledge that the total job and the proportions of lumber and knocked down materials might vary by 25%. With this in mind we think the trial court was not clearly in error in applying the provision to the solution of the problem presented to it.

■ It is claimed by the government that there is no legal proof as to the reasonable sum to be paid for the hauling, but in our opinion the court had ample testimony to establish the correct sum. An

official basic table for hauling over Oregon highways was introduced. It was not shown definitely that the table was in effect as fixing official rates at the time the hauling was done, but several qualified witnesses testified in reference to it and stated that the rates provided therein were fair and reasonable for the hauling done under the contract.

The judgment of the court both as to the direct and cross appeals is affirmed.

GARRECHT, Circuit Judge (dissenting).

Herein are set forth only those facts that relate to the jurisdictional question of whether or not the dispute in this case concerns a question of fact arising under the contract.

This is an action under the Tucker Act, 28 U.S.C.A. § 41(20), against the United States to recover $7,199.99 for truck hauling services performed by the plaintiff. Judgment was rendered in favor of the plaintiff for $4,000. The defendant has appealed and the plaintiff has cross-appealed.

The plaintiff was a partnership engaged in the business of hauling by truck for hire. The manager of the business was the senior partner, John G. Lundstrom, who represented the plaintiff in the present transaction. The defendant was represented by Captain B. O. Garrett, stationed at the barracks at Vancouver, Washington, who was the contracting officer for the United States in the Army Quartermaster Corps.

In May, 1938, Captain Garrett telephoned to Lundstrom at Portland, Oregon, and informed him that the Government was contemplating the moving of two Civilian Conservation Corps camps to Redmond, Oregon, one from Camp Crabtree, near Lebanon, and the other from Camp Black Rock, near Falls City, both in Oregon. A day or two later Captain Garrett telephoned to Lundstrom about a rate for hauling from Camp Conconully, near Okanogan, Washington, to Redmond. On both occasions Lundstrom quoted tentative rates to Captain Garrett.

A few days later, the plaintiff received from the defendant a written invitation for bids, including, among others, the three hauling jobs mentioned above. That invitation contained a number of provisions pertinent to the issue now before us, which were as follows:

"15. Disputes: Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer, subject to written appeal by the contractor within thirty (30) days to the head of the department concerned or his duly authorized representative whose decision shall be final and conclusive upon the parties thereto. In the meanwhile the contractor shall diligently proceed with performance."

"23. * * *

"It is the duty of each prospective bidder to familiarize himself with all the terms and conditions of this proposal and satisfy himself completely before submitting his bid. All prospective bidders are invited to consult with the District Quartermaster CCC, Vancouver Barracks, Washington [,] for any information desired."

"Note: The above supplies are composed of about 75 Ton of Lumber (Portable Knocked Down buildings and building material) and about 200 Ton of Lumber for each shipment."

The plaintiff submitted a bid and was awarded the contract.

Captain Garrett, whose rank had been raised to that of Major by the time the trial was held, testified that at some time before the contract was signed, either before or after Lundstrom received the invitation for bids, Lundstrom called upon him presumably for the purpose of obtaining "information upon which to base a quotation of rates," based not "upon the language in the Invitation for Bids with reference to the seventy-five tons," but "upon what was actually to be hauled". Major Garrett stated that he informed Lundstrom of the Government interpretation of what is meant by lumber and knocked-down buildings. Concerning this conversation with Lundstrom, the Major further testified: "I said that 'There is a Directive which tells us which of these is lumber and which is not lumber and you could see it', and, as I recall, I told him it was in Captain Farrell's office, my assistant, which is where the blueprints and all those things were ordinarily kept."

Asked the direct question as to whether or not Lundstrom did examine the Directive, Major Garrett replied: "It is my impression that he did. As near as I can recall it from this far back, I am pretty positive that he did do it." Captain Far-

rell specifically testified that he had shown the Directive to Lundstrom.

The Directive referred to by the officers was a document issued by the Adjutant General of the War Department, in which the classification "lumber" was shown as including such items as sills, beveled thresholds, weather stripping, seats and gable cornice molds. The court below found such a classification to be "unique", "utterly arbitrary and unreasonable", and possessing "quaintness", but conceded that the "United States had a right to contract for transportation even under unreasonable classifications."

The question of classification is important in this case, since, according to the plaintiff's brief, obviously materials consisting of portions of knocked-down buildings from walls, floors, roofs and the like, each of which contained as many as thirty pieces of lumber nailed or screwed together, "required a great deal more space on the loaded truck than a truckload of straight lumber, which would involve relatively little waste vacant space between the pieces of material". The contract rate for hauling was at a "composite" rate of so many cents per hundred pounds. The weight of the knocked-down buildings that could be hauled per truckload was naturally much less than if the loads had consisted entirely or principally of straight lumber. Consequently, according to Lundstrom, a much greater number of truckloads and trips were required.

Lundstrom denied that he had ever seen or heard of the Directive prior to the trial, and the trial court in its "Findings of Fact" stated that Lundstrom had no knowledge of it.

Lundstrom testified that he first learned the nature of the materials to be hauled when he received a long-distance telephone call from his driver after the latter had hauled his first load and had returned to Camp Crabtree. After receiving this call, Lundstrom said, he immediately telephoned to Captain Garrett, and, according to the former, the following conversation ensued: "I said that I had just received a long distance call from our driver on the job and he said there was not a thousand feet of lumber on the job and the Captain said, 'Well, that was lumber' and I said, 'Well, we had figured on the basis of hauling two hundred tons of lumber and seventy-five tons of knocked-down buildings, as our

basis for figuring the rate, and we couldn't get any loads on any type of material that we were hauling,' and he said, well, we would have to get more trucks down there and move that stuff faster * * * and that if we did not and didn't have it moved within the end of the Government fiscal year, by June 30th, and if it looked to him like we were not going to get it moved by that time, why, he would cancel our contract and hire additional trucks on the open market and move the material and tie up any funds we had coming on other contracts to pay for the difference, * * * and that we would be blacklisted from any future contracts."

Major Garrett substantially corroborated Lundstrom's testimony just quoted, except that he made no mention of having said, "Well, that was lumber". The officer did testify, however, that his interpretation that "lumber means the same or includes knocked-down buildings and panels" was based upon the Directive. He further explained that "lumber" includes "those things which do not contain millwork, that is, sash and door, insulating board"; in other words, which do not contain doors or windows.

From the foregoing, it will be seen that there was no dispute as to the actual materials that the plaintiff was compelled to haul. The controversy centers around the question of whether or not a substantial portion of the materials hauled could be classified as "lumber" under the contract, which provided that each shipment was to consist approximately of 75 tons of portable knocked-down buildings and 200 tons of "lumber". The plaintiff claims that no lumber whatsoever was furnished for hauling, but that the material hauled consisted entirely of knocked-down buildings. The defendant contends that the materials hauled were in accordance with the terms of the contract—that the intention of the parties was that portable knocked-down buildings were to be hauled, and that the materials making up such buildings consisted of various types of panels, some classified as "lumber" and the others as "knockdown houses".

There can be no question that if Lundstrom knew, or should have known, that the War Department, in awarding that type of contract, had adopted a certain interpretation of the word "lumber", he was bound by that interpretation when he

signed the contract. This would be true however "arbitrary", "unique", "unreasonable", or "quaint" that interpretation happened to be.

In the instant case, Lundstrom's bid was a "proposition" (10 C.J.S., Bid, p. 356); that is to say a "proposal" (Cent. Dict. and Cyc., vol. 7, p. 4781). When Lundstrom's "proposal" was accepted by the Government, it became a "promise" and Lundstrom became the "promisor". 17 C. J.S., Contracts, § 1, subsec. b.

In Star-Chronicle Pub. Co. v. New York Evening Post, 2 Cir., 256 F. 435, 441, the Court said: "If the language used is ambiguous, it is to be interpreted in the sense that the promisor knew, or had reason to know, that the promisee understood it." See also 17 C.J.S., Contracts, § 295, subsec. c.

There is true ambiguity when the same word is used in the same sentence with two different meanings. To ascertain what the parties meant by the word "lumber" in the "Note" set forth above—with and without the modifying phrases concerning the portable buildings—we must resort to evidence *aliunde,* if such evidence is offered. In the instant case, there is considerable evidence of this kind. As we have seen, Major Garrett testified that he told Lundstrom where he could find the definition of "lumber", and that Lundstrom examined the document. Captain Farrell corroborated the statement that Lundstrom saw the Directive. Lundstrom emphatically denied it.

Here, then, we have clearly a "dispute concerning questions of fact". It has been suggested, however, that it is not a "dispute" or a "question" "arising under this contract", within the purview of Paragraph 15, supra, for the reason that the conflict occurred during the trial, and related to an occurrence prior to the letting of the contract. Neither objection is valid.

In the first place, while the *narration* of the dispute necessarily occurred during the trial—else we should have nothing before us!—the *dispute* itself occurred during the performance of the contract. It started when Lundstrom telephoned to Captain Garrett that "there was not a thousand feet of lumber on the job", and the Captain replied, "Well, that was lumber." Not only was this a sharp difference of opinion, but it was a controversy accompanied by threats of blacklisting, holding up any payments that might be due on Lundstrom's other contracts with the Government, and the like.

Secondly, the testimony quoted above clearly shows that Captain Garrett's interpretation of what "lumber" meant was based upon the Directive. We therefore have to come back to the primary factual question of whether or not Lundstrom actually *saw* that Directive. If he saw it and then signed the contract, he is, as has been shown, bound by the Government's interpretation; if he did not see it, or was not given an opportunity to see it, he is not bound.

Finally, it should be noted that the time-element is not important under Paragraph 15. The dispute therein referred to need not occur "during" the contract; it need arise only "under" the contract. A proper analysis of the evidence in the instant case, however, leads to the conclusion that the dispute here presented occurred both "under" and "during" the contract.

It is well established that, while the construction of written instruments is a matter for the court, there are cases where the true meaning of the terms should be left to the jury. In such cases, the true meaning is consequently not a matter of law, but, as here, a question of fact.

In Brown & Co. v. McGran, 14 Pet. 479, 39 U.S. 479, 10 L.Ed. 550, Mr. Justice Story said: "It is certainly true, as a general rule, that the interpretation of written instruments properly belongs to the court, and not to the jury. But there certainly are cases, in which, from the different senses of the words used, or their obscure and indeterminate reference to unexplained circumstances, the true interpretation of the language may be left to the consideration of the jury, for the purpose of carrying into effect the real intention of the parties."

Again, in Richardson v. City of Boston, 19 How. 263, 270, 60 U.S. 263, 270, 15 L. Ed. 639, the Court used the following language: "It is the duty of the court to construe written instruments; but the application of their provisions to external objects described therein is the peculiar province of the jury."

This court has consistently adhered to the same doctrine. In Phœnix Tempe Stone Co. v. De Waard, 9 Cir., 20 F.2d 757, 762, we said: "But where technical terms

of science, art, or trade are employed, or common words are used in an unusual sense, or where—as here—symbols, lines, or marks are used, the significance of which is not commonly understood, testimony may be received from persons familiar with such use to explain the meaning, and if the testimony is conflicting it is for the jury in the light of the testimony to determine the real understanding and agreement of the contracting parties."

Other decisions to similar effect in this circuit are Butte & B. Consol. Min. Co. v. Montana Ore Purchasing Co., 9 Cir., 121 F. 524, 527, 528, 529; Chas. H. Lilly Co. v. Brent, 9 Cir., 186 F. 700, 703, 705; Copp v. Van Hise, 9 Cir., 119 F.2d 691, 695.*

An examination of the authorities, therefore, convinces one that we have here a "dispute concerning a question of fact" within the sweep of Paragraph 15 of the contract. Not only do we have an ambiguity in the dual use of the word "lumber" in the "Note", but we have a case where there is, evidence that the promisor [Lundstrom] "knew, or had reason to know, that the promisee [Captain Garrett] understood" the word to have the meaning for which the Government is contending. It is to be observed that the "Note" referred to above is incorporated in Lundstrom's bid, immediately preceding his signature.

Being one "concerning a question of fact", the dispute should have been submitted in a written appeal to the head of the department concerned. Admittedly, this was not done.

The Supreme Court has consistently held that in a controversy of this kind administrative remedies must be exhausted before recourse can be had to the courts. This rule has been applied even when resort to administrative remedies would be, as is here hinted, an idle gesture.

In Myers v. Bethlehem Shipbuilding Corporation, 303 U.S. 41, 50–52, 58 S.Ct. 459, 463, 82 L.Ed. 638, the Supreme Court, after referring to "the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted," continues:

"That rule has been repeatedly acted on in cases where, as here [and also in this case], the contention is made that the administrative body lacked power over the subject matter.

"Obviously, the rule requiring exhaustion of the administrative remedy cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage. Lawsuits also often prove to have been groundless; but no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact."

In the Myers case, as here, the argument was made that "hearings [before the National Labor Relations Board] would, at best, be futile." Despite this contention, the Supreme Court held that "there was an insuperable objection to the maintenance of the suit in point of jurisdiction."

---

* Without multiplying quotations, there are listed below a few cases on this point decided by some of the other United States Circuit Courts of Appeals:

*First Circuit*—S. S. Kresge Co. v. Sears, 87 F.2d 135, 140, 110 A.L.R. 583, certiorari denied, 300 U.S. 670, 57 S.Ct. 512, 81 L. Ed. 876.

*Second Circuit*—C. H. Pope & Co., Inc., v. Bibb Mfg. Co., 290 F. 581, 586, 588.

*Third Circuit*—Monongahela & W. Dredging Co. v. Jones & Laughlins Steel Co., C.C.W.D.Pa., 144 F. 312, 313, affirmed, 150 F. 298, 300, 301; Donner v. Alford, 136 F. 750, 754; Ries v. Dodson, 46 F.2d 68, 69.

*Fifth Circuit*—Cameron Mill & Elevator Co. v. Chas. F. Orthwein's Sons, 120 F. 463, 469.

*Sixth Circuit*—Coney Island Co. v. McIntyre-Paxton Co., 200 F. 901, 909, 910; Ohio & Michigan Coal Co. v. Clarkson Coal & Dock Co., 266 F. 189, 192; Canadian Nat. Ry. Co. v. George M. Jones Co., 27 F.2d 240, 243; Sinclair Refining Co. v. Refiners Oil Co., 75 F.2d 851, 852.

*Eighth Circuit*—Luse v. Martin, 215 F. 28, 31; American Nat. Red Cross v. Raven Honey Dew Mills, 74 F.2d 160, 162; Pike Rapids Power Co. v. Minneapolis, St. P. & S. S. M. R. Co., 99 F.2d 902, 916, certiorari denied, 305 U.S. 660, 59 S.Ct. 362, 83 L.Ed. 428; Id., 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040, petition for rehearing denied, Minneapolis St. P. & S. S. M. R. Co. v. Pike Rapids Power Co., 306 U.S. 667, 59 S.Ct. 487, 83 L.Ed. 1062.

See also O'Connor v. West Sacramento Co., 189 Cal. 7, 18–21, 207 P. 527; 18 Fed.Dig., Contracts, ☞176, pp. 330–336; 2 Federal Law of Contracts, pp. 78-79; 3 Williston on Contracts [1936 Ed.] §§ 616, 618, pp. 1772-1773, 1778, 1780; 17 C.J.S., Contracts, § 295, subsec. a, note 41, p. 692; note 48, p. 694; § 296, note 59, p. 696; § 620, pp. 1289, 1290, especially note 67.

See also Plumley v. United States, 226 U.S. 545, 547, 548, 33 S.Ct. 139, 57 L.Ed. 342; Merrill-Ruckgaber Company v. United States, 241 U.S. 387, 391, 392, 393, 36 S. Ct. 662, 60 L.Ed. 1058.

Accordingly, the judgment should be reversed.