[Civ. No. 12681. First Dist., Div. Two. Mar. 28, 1945.]

BOSTON IRON & METAL COMPANY (a Corporation), Plaintiff and Appellant, v. WILLIAM ROSENTHAL, Defendant and Appellant.

Anthony & Rogers, H. M. Anthony and Henry J. Rogers for Plaintiff and Appellant.

William H. Hollander and Nathan Kessler for Defendant and Appellant.

GOODELL, J.—On April 20, 1937, a contract was entered into between William Rosenthal as seller and Boston Iron & Metal Co. as buyer for the sale of 4,000 to 4,500 gross tons of scrap steel at $30 per gross ton, delivered Japan, for shipment

during May, June, July and August, 1937. Three cargoes were shipped, the first from Honolulu and the other two from Oakland, weighing in all, according to weights at points of shipment, 1,457.09 gross tons. On July 12, 1937, the Boston Company by telegram and letter notified Rosenthal that no further shipments should be made.

Boston Company's evidence showed that the weight of the first two cargoes at destination was 38.32 gross tons less than at points of shipment. It also disclosed that 536.68 pounds of material in the first cargo exceeded in size the limits set by the contract. Invoices with shipping documents had been sent to Boston Company when the shipments were made, and immediately paid. The plaintiff brought this action for $1,306.51, of which $1,150.87 was claimed as an overpayment because of the shortage in weight, and $155.64 as a penalty for the oversized material. When the defendant answered he filed a cross-complaint for breach of contract arising out of the repudiation as to the 2,542.91 tons remaining unshipped at the time of cancellation. Judgment went for the cross-complainant. The court found Rosenthal's damages to be $7,598.64, but deducted the $155.64 (which was conceded) for the oversizes, and entered judgment for $7,443 against the plaintiff.

Plaintiff appeals, contending that it is entitled to judgment for the short weights because, it claims, the seller was obligated to deliver in Japan and therefore landed weights should control. Its other contention is that the measure of damages should have been based on values at Kobe and that no such values were proved; also that Rosenthal acquiesced in the cancellation and was guilty of laches and that this is a case of commercial frustration.

Defendant appeals on the ground that the award of $7,443 is insufficient.

### The Boston Company's Appeal

The questions (1) whether shipping weights or landed weights should control, and (2) whether values here or in Japan should form the basis of the measure of damages, invite the inquiry as to where the contract was to be performed; where title was to pass.

The writing sued on is dated Baltimore, April 20, 1937. It describes the material, shows the tonnage, and then

provides as follows: "Price: Thirty Dollars ($30.00) per gross ton, delivered Japan. Shipment: During month of May, June, July, August, 1937. Terms: All payment to be cash against the following documents: Certificate of weight, Mate's receipt that he has received the weight on the ship, prepaid freight bills, and invoices in duplicate. Remarks: Material to be loaded in vessel, insurable, under the nominal rates of insurance. Proper destination as to port delivery will be furnished upon advice as to the amount of tonnage you are ready to ship." Under Boston Company's signature appears: "Accepted: C. & F. Japan Accepted Ports. Wm. Rosenthal."

The cross-complaint, in addition to stating a cause of action for damages, pleaded that at and prior to the making of the written contract the parties agreed that the defendant would ship all material in the name of the plaintiff, procure at his own cost marine insurance in the name of the plaintiff and for its benefit, and deliver the marine insurance policies to plaintiff; and that these matters had been omitted from the written contract by mutual mistake. The prayer asked for reformation. It was stipulated and the court found that the parties had signed the writing in the belief that it embodied these omitted matters.

The first cargo was shipped on the S. S. "Ethan Allen" from Honolulu. An affidavit was furnished showing the weight to be 1,018,450 pounds, or 454.665 gross tons. The court found that material of that weight was loaded aboard ship, but also found that the weight of the cargo on arrival at Kobe was only 437.55 gross tons. The second shipment was on the S. S. "Golden Tide" from Oakland. Weight certificates were furnished showing the weight to be 1,161,920 pounds, or 518.7142 gross tons. The court found that material of that weight was loaded, but that the cargo at Kobe weighed only 497.51 gross tons. When each shipment was made the defendant delivered to the plaintiff an invoice, a bill of lading, prepaid freight bills, certificates of railroad or truck weights and an insurance policy. The contract called for payment against such documents. The contract also called for a mate's receipt showing the weight on the ship, but the court found that compliance with that provision had been waived.

The parties by stipulation defined the issues to be tried.

The first question was whether plaintiff was "obligated to pay for merchandise 'delivered Japan' only?" and the second: "When defendant delivered to plaintiff bill of lading, certificates of railroad or truck weights, insurance policies and invoice did defendant fulfill his contract obligations?"

Boston relies upon the words "delivered Japan" as creating a condition that Rosenthal had to actually land the material there. ▮ There is nothing in the contract touching the place of delivery other than may be suggested by the words "delivered Japan," and it is settled law that "if, in a contract for purchase and sale of goods to be shipped to a given point, nothing is stated as to the place of delivery, the delivery to the buyer is complete when it is made to the common carrier at the place where the seller produces them or has them for sale." (1 Williston on Sales (2d ed.), § 280h, p. 623; *Pond Creek etc. Co.* v. *Clark,* 270 F. 482, 486.) Counsel for Boston have submitted no authority holding that the words "delivered Japan" mean what they claim. On the other hand, in *Meyer* v. *Sullivan,* 40 Cal.App. 723 [181 P. 847], this court held, where the words "f. o. b. Kosmos steamer at Seattle" gave rise to a controversy as to precisely where delivery was intended, that the trial court properly admitted parol evidence of custom and usage to aid in determining that question. ▮ In the instant case the words "delivered Japan" are part of the sentence "Price: Thirty Dollars ($30.00) per gross ton, delivered Japan." The trial court was undoubtedly satisfied, as we are, that the words in that collocation were used to refer to and qualify price, and not to indicate the point of delivery or where title was to pass. The other provisions of the contract, which were performed to the letter, are consistent with this view, for marine insurance and ocean freight were paid by the seller, which rendered the price of $30 per ton inclusive of all charges up to the actual landing of the cargo in Japan. In short, it was a "delivered Japan" price. In *Meyer* v. *Sullivan, supra,* the court points out that the trial court had determined that the phrase "f. o. b. Kosmos steamer at Seattle" had been "used therein in connection with the price of the grain only, and not as fixing the exact place at which it should be delivered. In arriving at this conclusion" says the court "the trial court was assisted by the position of the clause in the contracts, used as it was, in connection with the words fixing the price of the wheat sold." The rule is then cited with authorities. In *Pond Creek etc. Co.*

v. *Clark*, 270 F. 482, 486, *supra*, the rule was thus stated: "It is quite generally accepted as the law that where in a contract the price of goods is fixed, and in connection with the price is employed the term 'f. o. b.' at a given point, it means that this refers to and qualifies only the price, and does not indicate that the seller is actually to deliver the goods at the indicated point, and it is construed to have no reference to delivery, but that wheresoever the goods may be shipped the seller will either pay freight to the indicated point, or, if the goods are not shipped there, will deduct or permit the purchaser to deduct from the fixed price an amount equivalent to the freight on such a shipment to the point indicated." (Identical language is found in 1 Williston on Sales (2d ed.), § 280h, p. 622.) The Pond case held that the words "basis Chicago" were used in the contract to refer to and qualify the price, and did not mean or call for delivery at Chicago. The Pond case was followed in *Goodyear etc. Co.* v. *Northern Assurance Co.*, 92 F.2d 70, 72, where the court points out that "F. O. B. cars New York City" was not found under the caption "Place of Delivery" but "Instead, the f. o. b. provision was placed under the heading 'Terms,' where it would seem to have relation to price and to indicate that the cost of loading on cars was to be borne by the seller. . . ." (See, also, for similar reasoning, *Orthwein's Sons* v. *Wichita etc. Co.*, 32 Tex.Civ.App. 600 [75 S.W. 364, 365], a case involving the phrase "delivered Galveston.") The case of *Willits & Patterson* v. *Abekobei & Co.*, 197 App.Div. 528 [189 N.Y.S. 525], relied on by Boston, is not in point, for there the contract specified "net landed weights." In the contract under review weights are not mentioned except where cash payment is called for against certain shipping documents including certificates *showing weight at point of loading*.

If the trial court at any time entertained any doubt because of the ambiguity of the phrase "delivered Japan" (see *Cameron etc. Co.* v. *Chas. F. Orthwein's Sons*, 120 F. 463 [56 C.C.A. 613], where the price of wheat "at 70½ cents per bushel, delivered Galveston" was held to be ambiguous as to where *delivery was to be made*), we are satisfied that such doubt must have been removed by the manner in which these shipments were handled. As appears earlier, the contract as reformed required Rosenthal to "ship all scrap iron shipped pursuant to said Agreement in the name of plaintiff." The buyer presumably had some reason for requiring

this, and it seems to have been an important one, for in three separate letters (dated May 24, May 28 and June 11, 1937), to Rosenthal, Boston says: "Documents for this shipment should show that the Boston Iron and Metal Company is the shipper, and material is to be shipped to our order at Kobe, notify Mitsui Bussan Kaisha, Ltd., Kobe, Japan." The bills of lading covering both shipments were made out *in the name of Boston Iron & Metal Co. as shipper,* cargoes deliverable *to the order of the same company,* notify Mitsui Bussan Kaisha, Kobe. Thus there was strict compliance with this requirement, imposed by the buyer who now urges that title was not to pass until the cargoes were landed in Japan. The court found that Rosenthal procured and paid for the marine insurance and delivered to Boston Company the policies issued in Boston's name and for its benefit, as required by the contract. The contract as reformed and as executed possessed all the attributes of a "c. i. f. Japan" contract. But, more than that, the fact that the bills of lading showed the buyer itself *as shipper and consignor* would seem to show rather conclusively that title became vested in Boston Company before the ship left the dock and that no scintilla of title remained in Rosenthal. There is no evidence of any collateral or extrinsic understanding between the parties that, despite these indicia of ownership, the seller retained the *jus disponendi* or that he could, once the bills of lading were signed, assert any control whatever over the goods. (55 C.J. § 367, p. 371.) Rosenthal thereafter apparently relied only upon the personal credit of the buyer. The risk from then on was Boston's and this was covered by marine insurance in its name for which Rosenthal had paid. In 55 Corpus Juris, section 367, page 371, it is said: "The delivery to the carrier must be such a transfer of possession as will remove the goods wholly from the dominion of the seller and such as to entitle the purchaser to demand the goods of the carrier" (citing *Ward-Lewis Lumber Co.* v. *Mahony,* 70 Cal.App. 708 [234 P. 417]). What was done in the case at bar removed the cargoes wholly from the dominion of the seller by putting them at once into Boston's name *as shipper.* It is difficult to see how the court could have arrived at any conclusion other than that the contract had been fully performed by Rosenthal and title had passed to the Boston Company when the material was loaded and the documents of title delivered to the plaintiff, all in the name of Boston. That being so, and the court

having found that the weights at points of shipment were exactly as claimed by Rosenthal, the weights at Kobe become wholly immaterial.

■ Other points made by Boston are that Rosenthal acquiesced in the cancellation of the contract and was guilty of laches; that his cross-complaint for damages was an afterthought, and that this was a case of commercial frustration. Rosenthal by his cross-complaint pleaded a breach of contract by Boston, arising out of the cancellation of July 12, 1937. This pleading, which set forth a clear-cut case of prevention of performance as to the remaining 2,542.91 tons, required Boston to set up whatever defenses it had to these claims. (See 2 Cal.Jur. § 67, p. 236.) Instead of pleading commercial frustration, acquiescence and laches, it pleaded that Rosenthal had been guilty of the first breach in that he failed prior to the cancellation "to perform the conditions on its (his) part"; that Boston had notified him of this failure and default; that the agreement "was thereby terminated," and that *for that reason* Rosenthal ceased to attempt delivery of the balance of the material. This, of course, was wholly inconsistent with any of these three points now urged on appeal. Incidentally, the court found against Boston on these allegations. The cancellation was on July 12, 1937. Boston's answer to the cross-complaint was filed almost four years later, when all the facts of the transaction must have been within its knowledge, and it certainly knew as much when it filed its pleading as when this case was briefed. Moreover, the parties on the eve of trial defined by stipulation the issues to be determined, and commercial frustration, acquiescence and laches were not among them. ■ It is settled law that on appeal there must be an adherence to the theory upon which a case is tried. (2 Cal.Jur. § 67 et seq., p. 234 et seq.)

■ Boston's last contention is that Rosenthal's damages should have been based upon values at Kobe. The preceding discussion answers this claim.

We find no merit in Boston's contentions.

### THE ROSENTHAL APPEAL

■ The court at first awarded Rosenthal $7,947.16. Boston moved for a new trial, and, instead of granting it, the court set aside its findings and judgment and reopened the case on the sole issues of damages. The record not only in in this respect, but throughout, shows extreme care and thor-

oughness on the part of the trial court. The findings show the precise method by which damages were computed. The cancellation left 2,542.91 tons unshipped, for which Rosenthal would have received, at the contract price of $30 a ton, $76,287.30. Ocean freight, marine insurance and other expenses of Rosenthal's because of the "delivered Japan" price, would have been $35,126.77, leaving a difference of $41,160.53. Between August 9 and September 30, 1937, Rosenthal sold 1,379.65 gross tons in five lots, which netted him $18,439.64. These five sales left 1,163.25 tons on hand which were sold by Rosenthal between January 25 and March 4, 1938, but the court found such latter sales were too remote. The court found that the market price at San Francisco of these 1,163.25 tons at the time of the breach and immediately thereafter was $13 per gross ton, net, which is $15,122.25. The result is $7,598.64, from which was deducted the $155.64 admittedly due Boston because of the oversizes, and judgment was entered for $7,443. No fault is found by Rosenthal with any of these figures except he claims that the market value instead of being $13 a ton was only $10.50. The only question is whether there is evidence sufficient to support the $13 figure. We are satisfied that there is.

In the first place the record shows that the price of scrap in this market for export was from $1.50 to $2.50 a ton higher than the domestic price. The witness Gruenebaum, called by Rosenthal, testified that the domestic price was in the neighborhood of $11 per ton and the export price $1.50 or $2.00 higher, in July, 1937. This testimony alone would suffice to support the finding. Rosenthal himself when questioned with respect to the reasonable market value as of July 12th and a reasonable period thereafter answered: "The market value local mills was around $11.50 a ton. . . . Q. And what is the export price on the same? A. Always $1.50 to $2.50, depending on how bad they want it—it always ranges from $1.50 to $2.50 a ton more than the local price." It is true that Rosenthal later testified to $12.50 a ton, as the export price, but the weight and persuasiveness of such testimony were questions for the trial court.

The foregoing testimony was given at the original hearing. After the case was reopened the court remarked that his recollection was that there had been other testimony as to value, to which Rosenthal's counsel responded: "Mr. Gruenebaum testified the reasonable market value was $13.50 and Mr. Rosenthal $12.50." From a reading of the record it would

seem that at the opening of the second hearing Rosenthal testified to $11.50 to $12.50 plus $1.50 to $2.50 a ton more, which would bring the export price up to a range of from $13 to $15. This would appear to be so, for the court was careful to inquire "that is $12.50 a ton plus what, did you say? A. $1.50 to $2.50. Mr. Hollander: Q. What would that differential be for, was that export? A. Yes. . . . Q. In other words, that would be the naked price in San Francisco? A. That is right." Later, undoubtedly referring to this testimony, the court remarked that Rosenthal had "increased it from $13. to $15. a ton this morning." Later on Rosenthal was questioned as to the *net* "reasonable market value" and he answered $10 and $10.50 a ton. He was not asked, nor did he say, whether this was the domestic or the export price but he certainly must have meant domestic in view of his earlier testimony. In addition to this testimony there is documentary evidence showing that during August (which was within the contract's time range for performance) Rosenthal sold on the 9th, 82.64 gross tons at $14.40 net per ton, on the 11th, 297.71 at $13.46 net and on the 18th, 420.76 at $13.46 net and that on September 30, which was a month beyond the time range for performance he sold 578.54 gross tons at $13.10. On July 26, 14 days after the cancellation, Rosenthal wrote Boston "Besides this 1500 tons of Rail, I have about 1500 tons of ship scrap and railroad scrap. The local mills are paying $12.50 per ton for scrap today, but I am going to hold on to this scrap for a little while and wait for a better market." Local mills of course meant *domestic market* and the export prices were higher, as we have seen. On August 19, 1937, (still within the contract's time range) Rosenthal wrote to Boston: "With regards to myself, I just got through shipping 1500 tons of heavy melting steel on the 'Asia' Maru which I sold for $16.55 f. o. b. dock Oakland, and there is 55c unloading and tolls which nets me $16.00, which is about $2.50 more than the mills are paying here. I have about 1000 tons left and will probably ship that the early part of next month, and that cleans me all up on the balance of the 'Monterey' and other miscellaneous railroad scrap that I had in my yard." With all this in the record we are satisfied that there was abundant evidence to support the court's finding that the market value was $13 a ton at the time of the breach and within a reasonable time thereafter.

The judgment is affirmed.

**Nourse, P. J., and Dooling, J. pro tem., concurred.**